1  CRAIG H. MISSAKIAN (CABN 125202)
   United States Attorney
2
   MARTHA BOERSCH (CABN 126569)
3  Chief, Criminal Division

4  ERIC CHENG (CABN 274118)
   AJAY KRISHNAMURTHY (CABN 305533)
5  ALETHEA M. SARGENT (CABN 288222)
   ALEXANDRA SHEPARD (CABN 205143)
6  Assistant United States Attorneys

7        1301 Clay Street, Suite 340S
         Oakland, California 94612
8        Telephone: (510) 637-3680
         FAX: (510) 637-3724
9        eric.cheng@usdoj.gov
         ajay.krishnamurthy@usdoj.gov
10       alethea.sargent@usdoj.gov
         alexandra.shepard@usdoj.gov
11
   Attorneys for United States of America
12
                    UNITED STATES DISTRICT COURT
13
                  NORTHERN DISTRICT OF CALIFORNIA
14
                         OAKLAND DIVISION
15

16  UNITED STATES OF AMERICA,           )  CASE NOS.    4:23-CR-00264 JSW-2
                                        )                4:23-CR-00269 JSW-1
17         Plaintiff,                    )
                                        )  **UNITED STATES' SENTENCING**
18    v.                                 )  **MEMORANDUM**
                                        )
19  MORTEZA AMIRI,                      )
                                        )
20         Defendant.                    )
                                        )
21  _____ )

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12

## I.     INTRODUCTION

Within five years of becoming a police officer, Antioch Police Officer Morteza Amiri betrayed the oath he swore to uphold the law.  Upon his assignment as a K-9 officer, Defendant Amiri began to violently dehumanize the population he was supposed to protect and serve: he hurt people as a form of punishment outside of the justice system, he celebrated the pain and injuries he inflicted with his K-9 "Purcy," and he covered up his actions with falsified reporting.  Moreover, Amiri took part in a scheme and conspiracy to defraud his employer, in which he presented a fraudulent bachelor's degree in Criminal Justice to obtain a pay raise by way of the educational incentives offered by Antioch.  While Amiri's convictions following two federal trials involved two distinct courses of criminal conduct, the timing of the conduct was intertwined.  The evidence presented to the jury in the two trials against Amiri indicates that he began to believe the law didn't apply to him.  At some point, Amiri began to enjoy breaking the law.

13
14
15
16
17

To be clear, the government acknowledges and respects the work of policing as a difficult and often dangerous job.  But had Amiri not been indicted by the federal grand jury in these two cases, his pursuit of inflicting injury and pain with his K-9 may have continued against the community and he would have continued collecting wrongfully enhanced financial incentives from the City of Antioch.  And despite his two indictments, Amiri has accepted no actual responsibility for his actions.

18
19
20
21
22
23
24
25
26

For these reasons and the considerations set forth below, the United States respectfully requests that the Court sentence Amiri to a Guidelines sentence of 97 months, followed by three years of supervised release with an order of restitution.  Such a sentence would be sufficient, but not greater than necessary, based on a consideration of the Guidelines calculation applicable to Amiri's convictions in these two cases—which appropriately includes enhancements for Amiri's use of a dangerous weapon, victim Adrian Arroyo's sustaining of bodily injury, and Amiri's obstruction of justice (and actually includes no increase from Amiri's convictions in the -264 case given the severity of the -269 case)—and the factors under 18 U.S.C. § 3553(a), given the seriousness of the offenses, their nature and circumstances, Amiri's history and characteristics, and the need for deterrence.

27
28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## II.     BACKGROUND

### A.     Factual Background[1]

Amiri was employed as a police officer by the City of Antioch in the Antioch Police Department (APD) in the Northern District of California beginning in November 2017, following approximately three years as an officer at the Brentwood Police Department.  PSR ¶ 106.

Case No. 4:23-CR-00264-2:

The City of Antioch offered to reimburse police officers up to $800 per year in educational expenses and paid its officers an additional 2.5% of their base pay for obtaining an Associate's degree and an additional 5% of their base pay for obtaining a bachelor's degree.  PSR ¶ 18.  The purpose of this program was to create incentives for police officers to become better educated, *id.*, as "a well-educated workforce was better informed, could make better decisions."  Trial (-264) Tr. 63.

In December 2019, Amiri contacted Savannah Reed, who was at the time in a relationship with former Pittsburg Police Department Officer Patrick Berhan.  PSR ¶ 19.  Reed testified that, prior to December 2019, she had taken online courses at a distance learning institution called California Coast University (CCU) on Berhan's behalf in order to permit to Berhan to take advantage of an educational incentive program through the Pittsburg Police Department.  *Id.*  Amiri asked Reed if she could—as she had done for Berhan—take CCU classes on his behalf, and offered to pay her per class.  PSR ¶ 19.  Reed agreed.  *Id.*  Amiri paid Reed between $200 and $350 for each class that she completed on his behalf. *Id.*  He told her he would "pay you as quickly as you do them / same day payment," PSR ¶ 20, and asked her not to "tell a soul about me hiring you for this. we can't afford it getting leaked and me losing my job and etc." *Id.*  He offered her a bonus for rapid completion so he could "coordinate my raise in a timely manner," *id.*, and briefly contemplated asking her to finish a master's degree until he realized "we don't get paid for it," *id*.

On April 17, 2020, CCU awarded Amiri a Bachelor of Science degree in Criminal Justice on the basis of courses that Reed had taken on Amiri's behalf.  PSR ¶ 21.  Amiri then applied for and received an educational incentive based on this degree.  *Id.*  The Antioch Police Department ultimately paid

---

[1] The facts set forth in this section are drawn from the PSR and the trial records from the two trials in this case.

1    Amiri an additional $10,526 in educational incentives based on the CCU degree that Reed completed on

2    his behalf.  PSR ¶ 22.

3            Case No. 4:23-CR-00269-1:

4            In early 2019, Amiri started talking about his desire to hurt people he encountered in his work as

5    a police officer.  *See, e.g.*, EXH 116, at pp. 49-52.  His coworker and friend, Eric Rombough, was

6    present for Amiri's first recorded canine bite in March of 2019.  Rombough described how in that

7    incident, "Purcy had not had a bite at that time yet. It was kind of reluctant to bite on.  So he was just

8    kind of nibbling and had to be forced onto the subject. […] Just repeatedly placed onto the subject."

9    Trial (-269) Tr. 857.  At trial, Rombough described Amiri's excitement after that first bite.  *Id.* at 858.

10   *See also* PSR ¶ 26.

11           As Amiri obtained more canine bites, he boasted about the injuries he inflicted with Purcy.  PSR

12   ¶ 27.  While APD required official documentation of K-9 bites, Amiri collected more explicit

13   photographs of subjects' injuries.  In one text message, he explained, "gory pics are for personal stuff.

14   cleaned up pics for the case [file]."  *Id.*  Following each bite, Amiri sent out text messages to other

15   officers and friends with the number of the bite from 1 to 28, a description of what happened, and/or

16   explicit photographs of the subject's injuries.  *Id.*  Amiri further communicated to others about his

17   intent, including to co-defendants Rombough and Wenger, desiring to "fuck some people up next work

18   week"; to "fuck someone up"; to "set up a dog bite and fuck him up"; and to "us[e] the dog" as the "best

19   punishment ever."  PSR ¶ 28.

20           Late in the evening on July 24, 2019, Amiri had made arrangements for his then-roommate,

21   Pittsburg Police Department Officer Timothy Manly Williams, to do a "ride-along" with him that night

22   because Manly was interested in joining the Antioch Police Department.  PSR ¶ 34.  Prior to the ride-

23   along, Amiri told Manly that he "wanted to get into something," which Manly understood to mean

24   finding a gun or drugs, getting into a car chase, "or even a dog bite."  *Id.*  The two set out with K-9

25   Purcy and drove around Antioch until Amiri pointed out a man riding a bicycle who Amiri told Manly

26   was on post-release community supervision.

27           Adrian Arroyo testified that he was riding his bicycle to his mother's house when he saw a patrol

28   car with no police lights or sirens drive towards him and then swing around and stop.  PSR ¶ 35.  An

officer, later identified as Amiri, got out of the car and ran towards Mr. Arroyo, asked him what he was doing, and told him to "come here." *Id.* Mr. Arroyo stopped his bike, and Amiri punched him. *Id.* Mr. Arroyo testified that he did not physically threaten the officer, but ended up on the ground with Amiri on top of him. *Id.* Manly, who observed the incident from approximately 15 to 20 feet away, testified that Mr. Arroyo didn't take a fighting stance, didn't try to run away, and didn't appear to be violent or resisting. *Id.* Amiri then called for K-9 Purcy from the vehicle. PSR ¶ 36. Manly opened the door, and K-9 Purcy then bit Mr. Arroyo, who was still on the ground, on his shoulder, back, and ear. *Id.* Shortly afterwards, Antioch Police Sergeant Robert Green arrived to assist Amiri with detaining Mr. Arroyo, and he testified that Mr. Arroyo was immediately compliant. *Id.* Amiri gloated about the results in text messaging communications to others, telling one person who he sent a photo to after the attack that "that's saliva and suspect flesh on Purcy's face lol." PSR ¶ 37. He then submitted a falsified police report about the encounter, omitting Manly's presence, writing that he "was alone and in a known violent neighborhood without any cover in an area with minimal lighting," and writing that Mr. Arroyo was "actively resisting arrest. . . and was in a fighting stance." PSR ¶ 40; EXH-200-7. To Manly in text messages, however, he admitted that "it wasn't even really a fight and more of just a resisting and making it a stretch of a 69 lol." PSR ¶ 40. California Penal Code section 69 refers to resisting, with threat or violence—something not at all committed by Mr. Arroyo that night as shown by the evidence presented at trial. PSR ¶ 38.

Amiri's pursuit of exacting extralegal punishment on suspects did not stop there, though. For example, in December 2019, he used Purcy to bite R.S., despite admitting to Rombough that R.S. was "proned out" at the time. PSR ¶ 32; EXH-116-1413. Amiri later admitted to Manly that he was concerned about potential repercussions by the police chain of command, because "it wasn't a good bite." Trial (-269) Tr. 1330 (Manly Testimony). In January 2020, Amiri deployed K-9 Purcy to bite C.H. after hearing about a manhunt on the radio and without telling other assigned officers about his involvement. PSR ¶ 31. In August of 2020, he lamented to coworker Devon Wenger that the injury to a defendant Purcy bit in Wenger's presence hadn't been more severe: "if pitt didn't have all those body cams and that was us... we would have fucked him up more. he didn't get what he deserved." PSR ¶ 28. The next day, while at a car stop with Wenger, suspect M.C. received "face punches," EXH-117-213-

216, despite Amiri writing in his report that he did not use any force beyond a takedown. EXH-430-8-9.

**B. Procedural History**

Amiri was charged in two Indictments on August 16, 2023: in Case No. 23-CR-264, with Conspiracy to Commit Wire Fraud in violation of 18 U.S.C. § 1349 (Count One) and Wire Fraud in violation of 18 U.S.C. § 1343 (Count Three); and in Case No. 23-CR-269 with Conspiracy Against Rights in violation of 18 U.S.C. § 241 (Count One), multiple counts of Deprivation of Rights Under Color of Law in violation of 18 U.S.C. § 242 (Counts Two through Five), and Destruction, Alteration, and Falsification of Records in Federal Investigations in violation of 18 U.S.C. § 1519 (Count Nine). PSR ¶¶ 1, 10.

On August 8, 2024, Amiri was found guilty of Counts One (Conspiracy to Commit Wire Fraud) and Three (Wire Fraud) in Case No. 23-CR-264 following a jury trial. PSR ¶ 3.

On March 14, 2025, Amiri was found guilty of Counts Two (Deprivation of Rights Under Color of Law) and Nine (Obstruction of Justice) in Case No. 23-CR-269 following a jury trial. *Id.* at ¶ 12.

Sentencing has been consolidated and set for June 24, 2025, before this Court.

**C. Guidelines Calculation**

The government and United States Probation Office ("Probation") agree that Amiri's Total Offense Level under the Sentencing Guidelines is at least 29, but the government submits that an additional two-level enhancement (more than minimal planning) applies as well, resulting in a Total Offense Level of 31.

Probation's Guidelines calculation includes two groupings, one for each of the above-captioned cases. First, the base offense level under Probation's calculations of the first group (conspiracy to commit wire fraud and wire fraud, from the -264 case) is 7, pursuant to U.S.S.G. § 2B1.1(a)(1); and a two-level enhancement applies as the loss exceeded $6,500, pursuant to U.S.S.G. § 2B1.1(b)(1)(B); this yields an adjusted offense level of 9. PSR ¶¶ 46–51.

The base offense level under Probation's calculations of the second group (deprivation of rights under color of law and obstruction, from the -269 case) is 14, pursuant to U.S.S.G. § 2B1.1(c)(17); a four-level enhancement applies for the use of a dangerous weapon, pursuant to U.S.S.G. § 2A2.2(b)(2)(B); a three-level enhancement applies for the victim sustaining bodily injury, pursuant to

1    U.S.S.G. § 2A2.2(b)(3)(A); a six-level enhancement applies for the offense being committed under color

2    of law, pursuant to U.S.S.G. § 2H1.1(b)(1)(B); a two-level enhancement applies for obstruction,

3    pursuant to U.S.S.G. § 3C1.1; this yields an adjusted offense level of 29.  PSR ¶¶ 53–60.

4           The government submits that a further two-level enhancement for more than minimal planning

5    applies pursuant to U.S.S.G. § 2A2.2(b)(1), which would bring the Total Offense Level to 31, and

6    objects to Probation's failure to include the enhancement.  According to Application Note 2 of U.S.S.G.

7    § 2A2.2, "[f]or purposes of subsection (b)(1), 'more than minimal planning' means more planning than

8    is typical for commission of the offense in a simple form . . . For example, waiting to commit the offense

9    when no witnesses were present would not alone constitute more than minimal planning. By contrast,

10   luring the victim to a specific location or wearing a ski mask to prevent identification would constitute

11   more than minimal planning" (emphasis added).  As the Application Note suggests, the inquiry is very

12   fact dependent.  *See*, *e.g.*, *U.S. v. Mobley*, 620 F. App'x 591, 591 (9th Cir. 2015) (in a robbery case

13   sentenced under U.S.S.G. § 2A2.2, the Court applied the enhancement where the defendants set up a

14   fake transaction, exchanged texts with the buyers, and lured them to a parking lot).  The focus of the

15   inquiry is on whether the crime was committed in more than its simplest form.  *United States v. Moore*,

16   225 F.3d 637, 642 (6th Cir. 2000) ("It is not necessary that a crime suggests planning in its most

17   deliberative form; rather, it is sufficient if the evidence suggests merely that the crime was not

18   committed in its simplest form.").  The facts introduced in this case at trial demonstrate that the crime of

19   conviction was more than assault by a police officer in its simplest form.  This is so because Amiri

20   specifically sought out the situation for the commission of the crime, and used the tools available to him

21   as a police officer to commit the offense.  Officer Timothy Manly Williams' trial testimony in this case

22   established, for example, that Amiri told Officer Manly that he "wanted to get into something" that

23   night, that after driving around in a police patrol vehicle for several hours without "getting into

24   something," Amiri identified a vulnerable victim who was familiar to him (Mr. Arroyo), that he knew

25   specifically to be on post-release community supervision (and thus legally subject to less due process),

26   that Amiri pulled the vehicle over without activating his lights and sirens, that he physically pinned Mr.

27   Arroyo to the ground, and then tried to release his K-9 to bite Mr. Arroyo using his remote door pop;

28   when the K-9 didn't appear, he sought Officer Manly's assistance to release the K9 from the vehicle.

The combined offense level of the two groupings takes on the second grouping's calculation (*i.e.*, given the severity of the second grouping, this first grouping is disregarded in the combined offense level), pursuant to U.S.S.G. § 3D1.4.  PSR ¶ 64.  Probation asserts that no acceptance of responsibility adjustment is warranted because "the defendant has not clearly demonstrated acceptance of responsibility for the offense."  PSR ¶¶ 66.  As discussed further below, the government agrees.

Amiri does not have a criminal history such that his Criminal History Category is I.  Amiri is disqualified from the adjustment for certain zero-point offenders, including because the offense of conviction is covered by § 2H1.1 (offenses involving individual rights), *see* § 4C1.1(a)(8).

Pursuant to the correctly-calculated Sentencing Guidelines set forth above, Amiri's advisory sentencing range is **97 to 121 months** of imprisonment.  (Under Probation's Guidelines calculation, his advisory sentencing range is 87 to 108 months.  PSR ¶ 111.)

## III.    DISCUSSION

### A.    Applicable Law

The Court should impose a sentence sufficient, but not greater than necessary, to reflect the purposes of sentencing that Congress identified in 18 U.S.C. § 3553(a)(2).  *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008).  The Court should begin the process of determining an appropriate sentence by calculating the correct sentencing range under the Guidelines.  *Id.*  After determining the appropriate Guidelines calculation, the Court should then evaluate the sentence for substantive reasonableness in light of the factors set out in Section 3553(a).  *Carty*, 520 F.3d at 991–93.

Under 18 U.S.C. § 3553(a), in arriving at the appropriate sentence for the defendant, the Court should consider these factors applicable to this case, among others:

> (1)    the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2)    the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (3)    the need for the sentence imposed to afford adequate deterrence to criminal conduct;
>
> (4)    the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct;

1          (5)    the need to provide restitution to any victims of the offense.

2    **B.    Recommendation**

3          The government respectfully recommends that the Court sentence Amiri to a sentence of **97**

4    **months of imprisonment**—representing the low-end of the correct Guidelines calculation (which

5    accounts for Amiri's planning with respect to the conviction for deprivation of rights under color of law)

6    or the middle of the range of Probation's calculation—followed by three years of supervised release,

7    with an order of restitution, based upon a consideration of the Guidelines and 18 U.S.C. § 3553(a)

8    factors.  A Guidelines sentence would be suitable in this case given that the calculation appropriately

9    accounts for Amiri's betrayal of the public trust by his defrauding of a public agency, the physical and

10   psychological harm caused by Amiri's conduct involving deprivation of rights, and his further

11   obstruction of justice.  Such a sentence would be sufficient, but not greater than necessary, based on the

12   nature of the offense and the history and characteristics of Amiri.

13         First, the government's recommended custodial sentence accounts for the seriousness of Amiri's

14   crimes and the nature and circumstances of the offenses.  As an initial matter, Amiri's defrauding of the

15   public coffer in Antioch by falsely claiming that he earned a degree actually falls out of the Guidelines

16   calculation, and this weighs in favor of the imposition of a sentence no less than the correctly-calculated

17   Guidelines range.  *See* U.S.S.G. § 3D1.4(c).[2]  As to Amiri's deprivation of rights and related

18   obstruction, the crimes driving the Guidelines calculation, the evidence at trial showed Amiri's

19   willfulness and deceit: he methodically sought out excuses to harm the citizens of Antioch to their great

20   psychological and physical peril, he specifically deprived victim Adrian Arroyo's rights, and he covered

21   up the crime with a falsified report.  Mr. Arroyo has described to the Court how he "did not feel free to

22   go out anymore, I did not feel safe to go out in public."  VIS at 1.  He felt "helpless."  *Id.*  He had

23   "nightmares."  *Id.*  The incident left him feeling he could not "trust people," and in particular "police

24   officers, the people that are supposed to help me."  *Id.* at 1-2.  And "he did what he did in a police

25   uniform."  *Id.* at 2.  And no wonder: the evidence showed, and the jury agreed, that Amiri, a sworn

26   officer, had brutally and willfully attacked Mr. Arroyo without justification, and then lied about that

27

28   _____
          [2] Even though the first grouping does not increase the applicable offense level, it "provide[s] a reason for sentencing at the higher end of the sentencing range of the applicable offense level."

1   attack to cover up his own actions and support Mr. Arroyo's arrest.

2          Second, Amiri's history and characteristics support the government's recommended sentence.

3   While he does not have a criminal history, unlike many others that come before this Court, Amiri was a

4   public servant sworn to uphold the rule of law.  It is from this position that Amiri exacted harm on

5   people in the community like Adrian Arroyo—people who may have had a criminal history or been on

6   probation, but had done nothing to deserve such an attack by Amiri's K-9 Purcy.  Despite the

7   senselessness of the objectively unreasonable attack on Adrian Arroyo (as the jury found so), Amiri's

8   statements to Probation indicate he still refuses to take any responsibility for his conduct.  He defends

9   his actions with respect to Mr. Arroyo and, contrary to the evidence introduced at trial, argues to

10  Probation and this Court that Mr. Arroyo "disregarded my commands" and that, "due to his resistance, I

11  called for my K-9 to bite him."  PSR ¶ 43.  He further claims that he "did not realize at the time that

12  such information [Manly's presence] may have needed to be included in my report."  *Id.*  But Amiri did

13  not just omit Manly; he affirmatively stated that he was "alone" as a justification to deploy his canine.

14  EXH-200-7.  In a similar fashion, Amiri deflects from his financial fraud on the City of Antioch by

15  pointing to others who had allegedly done the same.  *Id.*  While Amiri's statement to Probation at times

16  comes close to acknowledge that his actions were in fact wrong, Amiri continues to offer excuses that

17  suggest that he is primarily offended by the fact that he was caught by authorities and faces judgment for

18  it, rather than accepting any responsibility for those actions.

19         Third, the government's recommended sentence would serve as general deterrence to others in

20  positions of public trust—particularly sworn police officers—from committing, further organizing, and

21  covering up such crimes.  As this Court may recollect from the pretrial litigation in these related cases,

22  the FBI's investigation into an initially narrower view of police misconduct revealed a multiplying

23  number of crimes at issue.  And Amiri, with his communications relishing doing harm and exacting

24  extrajudicial punishment on those in the community, was among the worst.  A meaningful custodial

25  sentence would cause police officers to truly examine the conduct at issue and make sure that their own

26  conduct does not match it.  While Amiri's statements to Probation suggest some kind of inadvertent fall

27  from grace, the evidence presented at trial shows a different story: he was an officer who was

28  systematically looking to harm people, looking to find shortcuts that would allow him to harm (such as a

1  suspect being on PRCS), and looking to find ways to justify such harm even when it was not

2  appropriate.  This was not accident or oversight.  As the jury found, this was willful.  An appropriate

3  sentence should spotlight what bad police conduct—which is most recognizable through the bad intent

4  that underlies it—looks like.

5  The government also recommends a three-year term of supervised release for Amiri with the

6  conditions recommended in the PSR for the purposes of specific deterrence and rehabilitation.  While

7  the Court should additionally order restitution in the amount of $10,526 in case -264, the government

8  acknowledges that Amiri has previously deposited that amount to the Clerk of Court.  PSR ¶ 43.  In

9  addition to this amount, victim Adrian Arroyo has requested $3,120 in restitution, which includes

10  amounts for his lost bike, a lost silver chain, lost cash and clothing, and lost income for when he went to

11  court, was incarcerated, and otherwise was unable to work due to his injury and trauma.  VIS at p. 3.

12  This requested amount is in many ways limited by Mr. Arroyo's indigence and lack of ability in that

13  state to further organize his life.  He does not have receipts to show the value of his losses.  To the

14  government's knowledge, he has not sought therapy, although it would likely be a help to him.  Mr.

15  Arroyo just tries, day to day, to move on and make the best of the life he has.  But that has been severely

16  challenged by his experience on that night in 2019.

17  **IV.    CONCLUSION**

18  For the foregoing reasons, the United States respectfully requests that the Court impose a

19  sentence of 97 months of imprisonment, followed by three years of supervised release and the conditions

20  recommended in the PSR, and order restitution in the amount of $10,526 in case -264 and $3,120 in case

21  -269.

22  DATED:  June 16, 2025                              Respectfully submitted,

23                                                     CRAIG H. MISSAKIAN

24                                                     United States Attorney

25

26                                                     _____/s/_____

27                                                     ERIC CHENG
                                                       AJAY KRISHNAMURTHY
                                                       ALETHEA M. SARGENT
28                                                     ALEXANDRA SHEPARD
                                                       Assistant United States Attorneys