Kasey A. Castillo, Esq. [SBN 236690]
**KC LAW GROUP**
Mail: 31566 Railroad Canyon Road
Suite 2, PMB 1123
Canyon Lake, CA  92587
Telephone: (951) 364-3070
Email: kasey@kc-lawgroup.com

Michael D. Schwartz, Esq. [SBN 166556]
**THE MICHAEL SCHWARTZ FIRM**
3580 Wilshire Boulevard, Suite 1260
Los Angeles, CA 90010
Telephone: (323)793-6735
Email: mds@themichaelschwartzfirm.com

*Attorneys for Defendant.*
DEVON CHRISTOPHER WENGER

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA | Case No.: 4:23-CR-00269-JSW |
| | Trial Date: September 8, 2025 |
| Plaintiff, | Judge Presiding: Hon. Jeffrey S. White |
| v. | **DEFENDANT DEVON CHRISTOPHER WENGER'S MOTION FOR NEW TRIAL PURSUANT TO FED. R. CRIM. P. 33** |
| DEVON CHRISTOPHER WENGER, | |
| Defendant. | |

TO THE HONORABLE COURT, ALL PARTIES, AND COUNSEL OF RECORD:

### I.      INTRODUCTION

Comes the Defendant, Devon Christopher Wenger, by and through undersigned counsel, and respectfully moves this Court, pursuant to Federal Rule of Criminal Procedure 33, for an order granting a new trial in the interests of justice.

1

The jury's verdict was rendered in an atmosphere that violated Mr. Wenger's constitutional right to a fair trial. Multiple rulings —admitting inflammatory hearsay and co-conspirator statements, and permitting prejudicial officer commentary in videos — collectively produced a verdict that cannot stand. These errors, whether considered individually or cumulatively, undermined the integrity of the proceedings.

Rule 33 grants the Court broad discretion to ensure that justice is done. See *United States v. Alston*, 974 F.2d 1206, 1211 (9th Cir. 1992). The Ninth Circuit has emphasized that a new trial is warranted when "it is reasonably probable that the error materially affected the verdict." *United States v. Kellington*, 217 F.3d 1084, 1097 (9th Cir. 2000). That standard is met here.

## II.    PROCEDURAL BACKGROUND

Mr. Wenger was tried before this Court beginning September 9, 2025. The government's case relied heavily on testimony of a cooperating witness and voluminous text message exhibits among other police officers, many of which Mr. Wenger neither authored nor received. During trial, defense counsel repeatedly objected to the admission of co-conspirator statements, juror impartiality, and improper video evidence. The Court overruled or minimized many of these objections.

On September 15, 2025, the jury convicted Mr. Wenger. The following record issues preserved by defense warrants a new trial.

## III.    STANDARD OF REVIEW

Federal Rule of Criminal Procedure 33(a) provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." The rule is "broad in scope," permitting relief where prejudicial error has occurred, but also where "the trial resulted in a miscarriage of justice." Alston, 974 F.2d at 1211, (quoting *United States v. Lincoln*, 630 F.2d 1313, 1319 (8th Cir. 1980)).

**DEFENDANT DEVON CHRISTOPHER WENGER'S MOTION FOR NEW TRIAL PURSUANT TO FED R. CRIM. P. 33**

The Ninth Circuit has long recognized that Rule 33 vests the district court with "broad discretion" to grant a new trial. *Alston*, 974 F.2d ay 1211. Unlike Rule 29, which tests sufficiency of the evidence, Rule 33 "authorizes the trial court to weigh the evidence and evaluate the credibility of witnesses." *Kellington*, 217 F.3d at 1097. The ultimate question is not whether there was sufficient evidence to support the verdict, but whether the verdict is against the weight of the evidence or whether errors rendered the trial fundamentally unfair. *Alston,* 974 F.2d at 1211.

Although new trials should be granted *sparingly* and only in *exceptional* cases, the standard is met where it is reasonably probable that the error materially affected the verdict. *17 Bender's Federal Practice Forms.* Further, when constitutional errors are implicated — such as denial of the right to an impartial jury or confrontation — prejudice is presumed. *Remmer v. United States*, 347 U.S. 227, 229 (1954).

Thus, the Court must determine whether the cumulative effect of juror misconduct, evidentiary error, and prosecutorial advantage substantially influenced the jury's decision or left the Court with grave doubt as to the verdict's fairness. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 765 (1946)); *Borja v. Prunty*, 866 F. Supp. 451 (S.D. Cal. 1994). Where such doubt exists, the "interest of justice" demands a new trial under Rule 33.

## IV.     ARGUMENT

### A. Improper Admission of Co-Conspirator Text Messages

The Court improperly admitted inflammatory text messages among other officers that did not involve Mr. Wenger, violating FRE 801(d)(2)(E) and the Confrontation Clause.

Co-conspirator statements are admissible under FRE 801(d)(2)(E) only if the Court finds by a preponderance of the evidence that a conspiracy existed and that both declarant and defendant were members. *Bourjaily v. United States*, 483 U.S. 171, 175–76 (1987).

3

Mere acquiescence is not sufficient. *United States v. Lennick*, 18 F.3d 814, 819 (9th Cir. 1994). The Confrontation Clause prohibits admission of testimonial statements without cross-examination. *Crawford v. Washington*, 541 U.S. 36, 59 (2004).

Courts around the country have determined that highly prejudicial evidentiary errors, such as the improper admission of a non-testifying codefendant's extrajudicial statements, amounts to prejudice and supports Wenger's contention that he must be granted a new trial. See, *17 Bender's Federal Practice Forms* (citing to *United States v. Schmick*, 904 F.2d 936, 943 (5th Cir. 1990)). See also, *Bruton v. United States*, 391 U.S. 123 (1968); *Palmer v. Davey*, 729 Fed. Appx. 573, 575-76 (9th Cir. 2018); *Maxwell v. Roe*, 628 F.3d 486, 508 (9th Cir. 2010); *United States v. Brazel*, 102 F.3d 1120 (11th Cir. 1997); *United States v. Di Carlantonio*, 870 F.2d 1058 (6th Cir. 1989).

The Ninth Circuit requires "substantial, independent evidence" connecting the defendant to the conspiracy. *United States v. Larson*, 460 F.3d 1200, 1212 (9th Cir. 2006). Courts reverse when statements are admitted without adequate foundation. *United States v. Gil*, 58 F.3d 1414, 1420–21 (9th Cir. 1995) (reversal where defendant not tied to conspiracy by independent proof).

Here, the government introduced long text threads between Amiri and Rombough Wenger ("TR Vol. 4, 617:15-19; 618:20-25") neither authored nor received by Mr. Wenger. Defense objected: "passivity or acquiescence is a basis for a conspiracy." ("TR Vol. 4, 552:12-16") Nonetheless, the Court admitted them under FRE 801(d)(2)(E). With grave concerns and the sensitive nature and awareness of Crawford and out-of-court statements. ("TR Vol. 4, 561:25-562:4").

For the texts to be admissible as co-conspirator statements under Fed. R. Evid. 801(d)(2)(E), the following must be shown by a preponderance of the evidence: (1) that a conspiracy existed; (2) that the author of the ledgers and the party against whom they are

**DEFENDANT DEVON CHRISTOPHER WENGER'S MOTION FOR NEW TRIAL PURSUANT TO FED R. CRIM. P. 33**

offered were members of that conspiracy; (3) that the ledgers were made in furtherance of the conspiracy; and (4) that the ledgers were made during the conspiracy. *Bourjaily*, 483 U.S. at 175-76; *United States v. Peralta*, 941 F.2d 1003, 1007 (9th Cir. 1991), cert. denied, 503 U.S. 940 (1992); *United States v. Smith*, 893 F.2d 1573, 1578 (9th Cir. 1990); *United States v. Mouzin*, 785 F.2d 682, 692-93 (9th Cir.), cert. denied, 479 U.S. 985 (1986).

| Exhibit 102 Transcript Citation | Sender | Text Quotes | Wenger Mentioned? | Text Context |
|---|---|---|---|---|
| | | | | |
| ("TR Vol. 4, 617:226-618:1") | Rombough | I want to fuck someone up. 4/17/2020 | No | Government moved to admit 1968-1969; witness confirmed meaning was to use force. |
| ("TR Vol. 4, 618:10-16") | Rombough | Bro I need to hit someone with my flashlight. 4/17/2020 | No | Witness agree it was 'literal' – to strike someone with flashlight. |
| ("TR Vol. 4, 619:13-19") | Amiri | I miss working the streets man. | No | Chain identified as between Amiri and Rombough; admitted pages 1411-1413 |
| ("TR Vol. 4, 619:20-620:1") | Rombough/Amiri | I want to punch the shit out of someone. / Do it bro. | No | Exchange published from the same chain; 'road dog' reference discussed. |

**DEFENDANT DEVON CHRISTOPHER WENGER'S MOTION FOR NEW TRIAL PURSUANT TO FED R. CRIM. P. 33**

| Exhibit 102 Transcript Citation | Sender | Text Quotes | Wenger Mentioned? | Text Context |
|---|---|---|---|---|
| ("TR Vol. 4, 630:24-631:4") | Amiri | We need to smash heads on Monument. 8/20/2020 | No | Prosecution asked witness to read Amiri's line aloud; Monument Ave context. |
| ("TR Vol. 4, 632:4-18") | Rombough | Purcy got some meat. / Fuck that guy. | No | Sent in response to photos sent tin the thread; same Amiri-Rombough chain. |
| ("TR Vol. 4, 632:19-25; 633:8-11") | Rombough | Brah you've been killing it. | No | Complimentary text from Rombough to Amiri. |
| ("TR Vol. 4, 634:12-635:5") | Rombough/Amiri | Rombough says taser …/What about an ass whoopin?/You beat his ass? 8/24/2020 | No | Back-and-forth on proposed force options. |
| ("TR Vol. 4, 643:14-20") | Amiri | Do me a solid don't face me and report my COO sniffs on BWC. It will open the door for defense to criticize the alert. My angle doesn't get it all. 8/5/2021 | No | Request concerning body-worn camera recording; prosecutor read 'Mr. Amiri says here…;" |
| ("TR Vol. 3, 513:24-514:6") | Rombough/Amiri | You ready for your interview, turd?...I'm just gonna walk in and | | Witness identified his own blue-bubble |

**DEFENDANT DEVON CHRISTOPHER WENGER'S MOTION FOR NEW TRIAL PURSUANT TO FED R. CRIM. P. 33**

| | | drop the gun stats…/ LMAO! …my interview is gonna be more about why Purcy is a dirtbag…This is where the white privilege comes into play…" 8/23/2020 | | messages; Amiri's responses read into record. |
|---|---|---|---|---|
| | | | No | |

This case mirrors *Gil* — inflammatory statements of co-defendants admitted without independent evidence linking Wenger to those exchanges. Unlike in *United States v. Garcia*, 16 F.3d 341, 344–45 (9th Cir. 1994), where the defendant was tied to overt acts, Wenger was not involved in the text conversations. Admission of these texts misled jurors to convict based on association, violating both FRE 801 and *Crawford*. At issue, Wenger was neither the subject of nor were these lines of text authored by Wenger. Wenger was not privy to the conversations and motive of Rombough who testified he rarely texted or spoke to Wenger.

B. Factors Under <u>*Van Arsdall*</u> and <u>*Whelchel*</u> <u>Establish That the Admission of Extrajudicial Statements in This Case Are Not Harmless Error and Are Prejudicial Effecting the Outcome of Trial.</u>

In determining whether the erroneous admission of out-of-court statements caused actual prejudice, the Court must consider the factors outlined in *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986), as applied in the Ninth Circuit through *Whelchel v. Washington*, 232 F.3d 1197, 1206 (9th Cir. 2000). Each factor demonstrates that the admission of co-

**DEFENDANT DEVON CHRISTOPHER WENGER'S MOTION FOR NEW TRIAL PURSUANT TO FED R. CRIM. P. 33**

conspirator text messages and officer video remarks was not harmless but instead had a substantial and injurious effect on the verdict.

First, the importance of the statements to the prosecution's case cannot be overstated. The government's conspiracy theory rested heavily on text message exchanges between other officers, including Amiri and Rombough, in which Mr. Wenger was neither a participant nor even referenced. *Infra Pp.* 5-7. These messages gave the government its most vivid evidence of a supposed culture of violence and collusion. Without them, the conspiracy allegation would have lacked connective tissue. Likewise, the officer commentary embedded in video exhibits, presented to the jury with the force of sight and sound, supplied an emotional narrative of mocking and cavalier attitudes toward force that went beyond neutral context. *Exhibits 511, 512, 513, 514, 515, 516, 525, 528, 552, 553, 554, 555.* These remarks framed the jury's perception of intent, suggesting that Wenger shared the same outlook, even though he never uttered the words. The prosecution relied on these statements to fill evidentiary gaps in its case, making them central rather than peripheral.

Second, the challenged statements were not cumulative of other properly admitted evidence. Unlike live testimony, the texts purported to reveal contemporaneous admissions among officers and were portrayed as candid glimpses into their mindset. Jurors were invited to see them as raw, unfiltered proof of agreement and motive. Similarly, the officer video remarks carried unique probative weight because of the medium itself.  The visceral impact of seeing uniformed officers laughing or making comments in real time cannot be replicated through paraphrase or testimony. Far from duplicative, these exhibits provided singularly damaging impressions that no other evidence conveyed.

Third, there was little corroborating evidence to blunt the prejudice of these statements. The government's case against Wenger was otherwise circumstantial, relying on inference and association rather than direct proof of his participation. Witness testimony

8

was inconsistent on key points, and there was no definitive physical evidence placing Wenger in the alleged conspiratorial agreements. The out-of-court statements thus operated as corroboration where none truly existed. As in *Whelchel*, where one witness's confession shored up shaky eyewitness identifications, here the texts and videos shored up otherwise weak links in the prosecution's chain, effectively creating corroboration out of inadmissible hearsay.

Fourth, the absence of meaningful cross-examination heightened the prejudice. Wenger had no opportunity to confront or test the credibility of the declarants in the text messages. The officers whose words appeared on screen were not examined about their context or intent. The government sidestepped the Confrontation Clause by labeling the statements "not for their truth," yet their substance was plainly inferentially incriminating. Without the crucible of cross-examination, the jury received untested, highly prejudicial statements under the imprimatur of admissible evidence, contrary to the core protections recognized in *Crawford*, 541 U.S. at 59.

Finally, the overall strength of the prosecution's case underscores that these errors were outcome-determinative. The government did not present overwhelming direct evidence of Wenger's personal involvement in specific uses of force. Instead, it relied on patterns, atmospherics, and guilt by association. In such a case, where the verdict depended on inferences rather than hard proof, the admission of inflammatory out-of-court statements carried disproportionate weight. The texts and videos supplied a narrative of collusion and culture that the government otherwise lacked. Without them, reasonable doubt was substantial. Their inclusion, therefore, cannot be deemed harmless, but rather had a substantial and injurious effect on the jury's verdict. *O'Neal v. McAninch*, 513 U.S. 432, 437-38 (1995).

In sum, applying the *Van Arsdall* factors, each weighs decisively in favor of finding prejudice. The erroneously admitted out-of-court statements were central to the

**DEFENDANT DEVON CHRISTOPHER WENGER'S MOTION FOR NEW TRIAL PURSUANT TO FED R. CRIM. P. 33**

prosecution's case, non-cumulative, unsupported by independent corroboration, immune from cross-examination, and decisive in a case of otherwise modest strength. Under *Brecht*, 507 U.S. at 637, the record reveals more than grave doubt as to whether these errors influenced the jury's decision. They plainly did. The interests of justice therefore require a new trial under Rule 33.

C. Admission of Officer Video Statements

The Court improperly admitted video clips containing officer remarks that were testimonial and highly prejudicial.

Out-of-court statements offered for their truth violate FRE 802. Even when offered *for context*, statements must be excluded under FRE 403 if prejudice substantially outweighs probative value. *United States v. Sanchez-Lima*, 161 F.3d 545, 547–48 (9th Cir. 1998). Jurors cannot be expected to compartmentalize highly prejudicial statements. *Bruton*, 391 U.S. at 135.

Courts distinguish neutral context from prejudicial narrative. In *United States v. Solorio*, 669 F.3d 943, 955 (9th Cir. 2012), admission was upheld where comments were neutral. But where statements carry prejudicial content, admission is reversible. *United States v. Mitchell*, 502 F.3d 931, 965 (9th Cir. 2007).

The government played post-shooting video clips containing officer jokes and remarks ("TR Vol. 5, 900:3-12"), insisting they were not hearsay but "effect on listener." Defense objected. The Court overruled, allowing the jury to hear inflammatory officer banter.

Unlike in *Solorio*, these comments mocked victims and trivialized violence — precisely the type jurors would consider as substantive proof of guilt. As in *Mitchell*, jurors could not disregard their impact. The statements' minimal probative value was overwhelmed by unfair prejudice, violating FRE 403 and Wenger's confrontation rights.

10

D. <u>A New Trial Is Required Because The New Evidence of the Berryhill Report Establishes That the Government's Text Message Evidence Is Unreliable</u>

The newly discovered Berryhill forensic report (See Exhibit A) establishes that the text message evidence, which was central to the prosecution's case, was fatally compromised by poor evidence handling and a contaminated extraction process. Under Federal Rule of Criminal Procedure 33, the Court may grant a new trial if the interest of justice so requires. When the motion rests on newly discovered evidence, the Ninth Circuit applies a five-part test: the defendant must show that the evidence is newly discovered, that the defendant was diligent in uncovering it, that the evidence is not merely cumulative or impeaching, that it is material, and that it is of such a nature that it would probably result in an acquittal. *United States v. Hinkson*, 585 F.3d 1247, 1264 (9th Cir. 2009) (en banc).

Although prior counsel did not pursue this option, the undersigned counsel made considerable efforts to obtain the expert report despite logistical challenges. Regrettably, due to the constraints of the discovery timeline and the unavailability of further continuances, the report could not be finalized or submitted by the Court's designated cutoff date for the Joint Exhibit List and discoverable material.

The Berryhill report meets this standard. The report documents that no chain of custody logs exist for the period between seizure of Mr. Wenger's iPhone and its forensic extraction, meaning there is no reliable accounting for who accessed or handled the device during that time. The report also establishes that the device showed nearly continuous activity during the hours before extraction, suggesting that the phone was manipulated prior to forensic imaging. Finally, the report concludes that the extraction process contaminated the phone's file structure far beyond what is ordinarily expected, raising the likelihood of alteration or fabrication of data. Together, these findings undermine the reliability of the text messages presented at trial and go directly to the heart of the prosecution's case.

Ninth Circuit precedent demonstrates why this new evidence requires a new trial. In *United States v. Kulczyk*, 931 F.2d 542 (9th Cir. 1991), the court granted relief where newly discovered evidence cast doubt on whether the government's key witness testimony was reliable, emphasizing that new evidence undermining the credibility of critical evidence could not be brushed aside. Similarly, in this case, the Berryhill report does not simply impeach a tangential witness but rather undermines the reliability of the prosecution's core exhibits: the text messages. Without assurance that the messages were authentic and untampered, the government's case loses its evidentiary foundation.

Moreover, the absence of chain of custody records parallels the evidentiary concerns in *United States v. Matta-Ballesteros*, 71 F.3d 754, 769–70 (9th Cir. 1995), where the Ninth Circuit recognized that gaps in the handling of seized evidence could call its reliability into question. Unlike in *Matta-Ballesteros*, where the government could still establish sufficient reliability through other circumstantial evidence, here there is no comparable safeguard. The lack of logs coupled with unexplained phone activity renders the government's evidence far less reliable than that upheld in *Matta-Ballesteros*, making this case more troubling.

The authenticity problems here also resembles the digital evidence issues in *United States v. Lizarraga-Tirado*, 789 F.3d 1107 (9th Cir. 2015), where the court stressed that electronic data must be carefully authenticated because of its susceptibility to manipulation. In *Lizarraga-Tirado*, the Ninth Circuit ultimately found that the evidence was properly authenticated because metadata could be traced back to its source. *Id*. at 1109. In contrast, the Berryhill report shows that Mr. Wenger's iPhone extraction is plagued with unexplained alterations and lacks any reliable metadata trail, making it precisely the kind of case where authentication has failed.

The Second Circuit's reasoning in *United States v. Jackson*, 345 F.3d 59, 76-77(2d Cir. 2003), which has been cited favorably in Ninth Circuit, see *United States v. Alcazar-*

12

*Barajas*, 2017 U.S. Dist. LEXIS 19523; 2017 WL 550238 (N.D. Cal. 2017) also illustrates the problem. In *Jackson*, the court noted that electronic messages cannot be admitted unless their integrity is demonstrably preserved. There, the government failed to meet its burden, and the evidence was excluded. The same logic applies here: the Berryhill report demonstrates that the integrity of the text messages was never preserved. Unlike in *Jackson*, where exclusion occurred before the jury ever saw the evidence, in this case the jury relied upon messages whose authenticity is now gravely doubtful.

Finally, the materiality of this newly discovered evidence cannot be overstated. The Berryhill report raises substantial questions about whether the government's digital evidence was trustworthy. It is more likely than not that these questionable texts as the sole evidence of the government's case altered the jury's assessment. Without credible text messages, the government's narrative of intent and conspiracy collapses.

In sum, the Berryhill report is newly discovered, could not have been obtained through due diligence prior to trial beginning and the court cutting off all discoverable material. It is not merely cumulative or impeaching and is directly material to the central issue of authenticity of evidence and would likely produce an acquittal if presented to a jury. Unlike cases where newly discovered evidence merely supplements existing testimony, this evidence discredits the government's core proof. Under *Hinkson* and related authority, the interests of justice require a new trial.

E. <u>Cumulative Error</u>

Even if no single error alone warrants reversal, the cumulative effect of these errors deprived Wenger of a fair trial.

The Ninth Circuit recognizes that cumulative error can render a trial fundamentally unfair. *Parle v. Runnels*, 505 F.3d 922, 927 (9th Cir. 2007). Rule 33 empowers courts to grant a new trial when "the interest of justice so requires." Fed. R. Crim. P. 33.

13

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

The errors here did not occur in isolation. Text threads between other officers were admitted as *co-conspirator* statements. Officer video comments ridiculing victims were shown to the jury. The combined effect was to convict Wenger not on direct evidence, but on association, innuendo, and the rushed judgment of a compromised juror. This is the quintessential scenario where cumulative error requires a new trial.

## V.    CONCLUSION

For the foregoing reasons, and pursuant to Rule 33, Mr. Wenger respectfully requests that this Court vacate the judgment and grant him a new trial in the interests of justice.

Respectfully submitted,

DATED: October 2, 2025                              **/s/**
                                         Kasey A. Castillo, Esq.
                                         CA State Bar Number: 236690
                                         **KC LAW GROUP**
                                         31566 Railroad Canyon Road
                                         Suite 2, PMB 1123
                                         Canyon Lake, CA 92587
                                         Telephone: (951) 364-3070
                                         Email: kasey@kc-lawgroup.com

DATED: October 2, 2025                              **/s/**
                                         Michael D. Schwartz, Esq.
                                         CA State Bar Number: 166556
                                         **THE MICHAEL SCHWARTZ FIRM**
                                         3580 Wilshire Boulevard, Suite 1260
                                         Los Angeles, CA 90010
                                         Telephone: (323)793-6735
                                         Email:
                                         mds@themichaelschwartzfirm.com


                                         *Attorneys for Defendant,*
                                         DEVON CHRISTOPHER WENGER

**DEFENDANT DEVON CHRISTOPHER WENGER'S MOTION FOR NEW TRIAL PURSUANT TO FED R. CRIM. P. 33**

# Exhibit A

14 September 2025

Michael D. Schwartz, Esq.
The Michael Schwartz Firm
3580 Wilshire Blvd., Suite 1260
Los Angeles, CA 90010

Devon Wenger

Ref: BCF1282 (*United States v. Devon Christopher Wenger*)


Dear Michael and Devon,

Attached is my report of findings in this case.

Let me know if you have questions.


Jon A. Berryhill
President & COO
Berryhill Computer Forensics, Inc

Phone – 707-745-1405
Toll Free – 888-745-1405
www.computerforensics.com
info@computerforensics.com
P.O. Box 1674
Benicia, CA 94510

**Background**

I, Jon A. Berryhill, declare:

I am President and COO of Berryhill Computer Forensics Inc., a firm which specializes in the collection, preservation, analysis and presentation of digital evidence, including computer hard drives, flash media, smart phones and digital data. Our methods are court proven and ensure the integrity of the evidence and the chain of custody. The facts set forth in this declaration are based on my personal knowledge, and if called as a witness, I could and would testify thereto.

I hold a Bachelor of Science degree from Lamar University in Engineering Computer Science and a Master of Science degree from the American Public University System with a concentration in Digital Forensics. I received training in computer evidence handling, analysis and special investigations in the Air Force Special Investigations Academy, and I have been working in the field of computer forensic investigations for more than twenty-nine years. I have led computer forensic investigations for law firms, major corporations and small businesses, as well as for the United States Air Force (USAF). As a Major in the USAF, I was a Special Agent in the Air Force Office of Special Investigations, investigating crimes such as central systems fraud, homicide, theft, child pornography, and counterintelligence. I have also worked extensively with the California Department of Justice Advanced Training Center, serving as an instructor, curriculum developer, and teaching certified computer crime investigations courses. I have testified 58 times as an expert in computer forensics in the Superior Courts of the State of California, other state courts, United States District Courts, and in military courts in both civil and criminal cases. Additionally, I have provided 37 expert depositions.

Since being in private practice, I have conducted examinations of computer hard drives and other devices containing private and confidential information in more than 1280 cases in which I was entrusted with individual's personal data, corporate internal data and communications, financial data, privileged attorney-client information, trade secret information, patent and pending patent applications and confidential research and development information. These cases have included a broad spectrum of issues and parties, ranging from individuals involved in personal and financial disputes to multi-million-dollar corporate litigation.

My experience in conducting computer forensic analysis has included the analysis of more than 3550 computer hard drives and more than 7000 floppy disks, tapes, CD-ROMs, smart phones and digital media. Since being in private practice, I have provided computer forensic analysis and support to many local, state and federal law enforcement agencies in their criminal and civil investigations. These have included the California Employment Development Department, California Office of Real Estate Appraisers, California Department of Insurance, California Highway Patrol, California Attorney General's Office, Federal Bureau of Investigation, Bureau of Alcohol Tobacco and Firearms, Immigration and Naturalization Service Investigations Division, Palo Alto Police Department, San Mateo County Sheriff's Office, Half Moon Bay Police Department, the Santa Barbara Police Department and many state and federal public defender offices.

## Background

I have been asked by Devon Wenger and Michael Schwartz to review evidence and reports pertaining to his pending case.

## Evidence

On 6 Aug 2025, Samantha Thomas-Gomez delivered to this office a 2TB USB hard drive, s/n NAE3RDDR containing a number of reports and most notably, the file **00008101-00024D243861401E_files.zip**, purported to be the extraction of Mr. Wenger's phone performed on 23 March 2022. The phone in question is an iPhone 12 is assigned the number 925-695-4468 and IMEI 353040113672652.

## Analysis

Multiple reports and documents have documented the MD5 and SHA256 hash value for the referenced zip file showing it was created on 23 March 2022 with the following hash values.

```
File      = 00008101-00024D243861401E_files.zip
MD5       = eeee22568ffdd673bf177a7de8883c90
SHA256    = 6c7fc61d8e2d281e0463c201cc15979a03f4ba8005eb1ee8ac642eab9df6846b
```

I have independently computed both hash values for the file and confirm the file I have examined is a valid and correct copy of the file that was created on 23 March 2022. This data was extracted from Devon Wanger's iPhone that was taken from him sometime before 0900 PDT (1600 GMT) on 23 March 2022.

I have seen no chain of custody logs for Mr. Wenger's phone and he stated to me that none exist for the period of time from when the phone was taken from him on 23 March 2022 that covers the time up to when it was forensically processed later that day starting sometime around 18:12 UTC. While there may exist narrative reports that discuss this period of time, that is not the same thing as extemporaneously created documents showing the chain of custody identifying each and every person, in turn, that had possession and control of that piece of evidence. I can say that without exception it was my training and practice that any item of evidence I seized was accompanied by an evidence tag, created by me, that described the item, date/time and manor of taking that then showed who I turned it over to (most often an evidence custodian for proper secure storage). That person would then sign and date the evidence tag acknowledging receipt and transfer of possession.

The method of processing of the iPhone is suspect. Mr. Wenger has stated the phone was seized from him on 23 March 2022 sometime before 0900 PDT (1600 UTC). The provided GrayKey event log prepared by Darryl Holcombe shows the extraction tool's access started at 1820 UTC. An examination of the files and folder structure provided as the GrayKey extraction (described as the zip file in the evidence examined section of this report) shows that no less than 2266 files have last written date/time values that span nearly continuously from 1600 UTC all the way to 1916 UTC.

There are technical challenges in doing a proper forensic extraction from a smart phone. The process is actually quite different from how a forensic image copy is created from something like a computer, hard drive, thumb drive or other storage device. The tools widely used by both law enforcement and private industry are not capable of creating a forensic image copy of a smart phone. It is a compromise that has become best practice, to do a minimally invasive extraction of a smart phone's data. This requires either allowing the device to boot to its native OS and accomplishing the extraction from there, or allow the device to boot its native OS and then minimally install an "agent" program on the device and then performing an extraction. In either case, there will be some "contamination" of the file structure while the examiner and his/her software tools are taking control of the device. The goal is to keep that "contamination" to a minimum in both extent and scope.

The extent of contamination in this case goes far beyond what would be normally expected. The near continuous activity after the phone was seized shows that good evidence handling procedures could not have been followed and/or the forensic extraction process using this particular version or setup of the GrayKey tool is flawed. Even a flawed GrayKey extraction does not account for the activity documented before the GrayKey extraction began.

Among the items I was specifically asked to look into, there is an image of what appears to be a screen capture of a USPS package tracking web site. This item was presented to the Grand Jury as exhibit 244 and has a Bates stamp of US-2000387 in the lower right corner. I have no information as to the context of this image. This image is found on the evidence phone in the location -

/private/var/mobile/Library/Caches/com.apple.MobileSMS/Previews/Search/PhotosSearchSection-at_0_F1EC9556-21BC-4347-81FB-DC8844B94DBA.png

Both the content of the screen capture and associated metadata leads me to the conclusion that this screen capture was not performed on Mr. Wenger's phone. The upper left portion of the screen capture shows the phone's time "16:07" in a green oval shaped enclosure. I have observed no other screen captures on the evidence phone with this presentation of the time. In addition, the location and name of this image is not indicative of a screen capture performed on this evidence phone. The location of the image deep within the "PhotosSearchSection" of the SMS folder structure indicates this image was associated with text messaging in some way. The file name contains identifiers in the format of a message identifier number but I have not been able to locate an associated message for this image. I note that this image is in a small group of 5 other images all with a last modification date/time within 2 seconds of each other on 3-11-2022 at 17:24. The internal metadata contained in this image is devoid of the expected data fields found in a .PNG screen capture taken with this evidence device. It is clearly from some external source. I know of no evidence that tracked or pulled any information pertaining to this USPS tracking number. A current inquiry into the shown tracking number shows a packing label was made but was never sent or processed. It is unknown if that is accurate given the several years that have passed since this screen capture, and presumably the USPS tracking number, was generated.

Among the applications in use on the evidence computer is the messaging application Signal. The database for these messages is encrypted. The metadata for the 46.2 MB file **signal.sqlite** was last written 3-23-22 17:29:56 GMT. This time is nearly an hour and a half after the phone

was taken from Mr. Wenger and 45 minutes before the GrayKey extraction was started. There is no way to determine what or how many changes were made to this database and its messages. The evidence production contains what appear to be reports of message from the Signal application. It does not appear that any deleted Signal messages are identified. These reports only show the content of the Signal database once the GreyKey extraction had been completed.

I have reviewed the transcript of testimony of Darryl Holcome from 4-29-2025. On page 450, line 12, he was asked "Were there any messages directly between Harris and Wenger that had not been deleted?". His answer was "No". This statement is incorrect. An analysis of the evidence phone shows that 52 iMessage messages are in the active SMS.db database showing sent and received messages between Dan Harris and Mr. Wenger. These messages are from 10 Oct 2021.

I find no evidence of any text messages, either active or deleted, to or from Brendan Mahoney in the **SMS.db** file or associated with the iPhone text message application. The evidence discovery does contain what appear to be messages to and from Mahoney via the Signal application.

Other activity I was asked to research pertained to allegations that Contact records for Dan Harris and Brendan Mahoney had been deleted from the phone. The evidence production includes a Cellebrite generated report showing contact records for Dan Harris and Brendan Mahoney have been deleted, however, it appears these were duplicate records. The active contacts **addressbook.sqlitedb** file contains a record for Dan Harris with his phone number. This record was created in 2018. The same database also contains an active record for Brendan Mahoney, with his phone number, that was created in 2020.

**Conclusions**

The evidence production includes a number of reports generate with either the Axiom or Cellebrite tools. While I have no reason to question the existence of this material as it pertains to the state of the evidence phone's content once the GrayKey extraction was completed, the context of much of this data appears to be incomplete. Most notably, it is not possible to determine when the deleted messages or contacts were deleted and therefor, by who. This leads to the inevitable question of who is responsible for such deletions and when did they happen. These issues pertain directly to accusations of evidence tampering aimed at Mr. Wenger. The activity during the considerable period of time between when Mr. Wenger's phone was seized and the completion of the forensic extraction has not been documented and cannot be properly accounted for.

I believe there is ample evidence of both poor evidence handling and/or a contaminated forensic extraction process. The biggest unknown now is what happened, and by who, to the iPhone from the time it was seized until the GrayKey extraction process began. The actions of what appears to be an undocumented, amateurish or a ham-fisted "examination" of the iPhone (pre GrayKey) by unskilled, untrained and unauthorized persons seems much more likely. It is likely their actions significantly altered the content of the phone to an unknown and undiscoverable extent. It cannot be determined if any of the data manipulation and alteration that took place after the phone was

seized and before the GreyKey extraction was intentional or indeed what the purpose of those actions were.

Additionally, analysis conducted by the government has provided inaccurate and misleading information as demonstrated above. These facts lead to questions about the veracity of other evidence that has been produced in this case.

It is for these reasons that my opinion is that any evidence obtained from Mr. Wenger's iPhone has been un-reparably damaged and cannot be trusted.