CRAIG H. MISSAKIAN (CABN 125202)
United States Attorney

MARTHA BOERSCH (CABN 126569)
Chief, Criminal Division

ERIC CHENG (CABN 274118)
ALETHEA M. SARGENT (CABN 288222)
ALEXANDRA SHEPARD (CABN 205143)
Assistant United States Attorneys

    1301 Clay Street, Suite 340
    Oakland, California 94612
    Telephone: (510) 637-3680
    FAX: (510) 637-3724
    eric.cheng@usdoj.gov
    alethea.sargent@usdoj.gov
    alexandra.shepard@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| UNITED STATES OF AMERICA, | ) CASE NOS. 4:23-CR-00268 JSW-2 |
|---|---|
| Plaintiff, | )                4:23-CR-00269 JSW-3 |
| v. | ) **UNITED STATES' SENTENCING MEMORANDUM** |
| DEVON CHRISTOPHER WENGER, | ) |
| Defendant. | ) |

**I.    INTRODUCTION**

      Antioch Police Officer Devon Wenger betrayed the oath he swore to uphold the law by conspiring with fellow police officers to use excessive force against the people of the East Bay and conspiring to distribute illegal steroids, and by destroying and falsifying evidence. As shown in the evidence presented to the jury in the trials against him convicting him of these crimes, Wenger behaved as if he was above the law, and his actions and post-trial submissions show that he continues to refuse to take any responsibility for his criminality.

The government acknowledges and respects the work of policing as a difficult and often dangerous job. But Wenger's conduct shows that he in fact had little regard for the law at all, beyond the position and excuse it gave him to cause harm to members of the community.

For these reasons and the considerations set forth below, the United States respectfully requests that the Court sentence Wenger to a significant custodial sentence within the Guidelines range of 108 to 135 months, given the seriousness and nature and circumstances of the offense, Wenger's history and characteristics, and the need for deterrence.

## II.     BACKGROUND

### A.     Factual Background[1]

Wenger began working as a police officer with the City of Antioch's Police Department (APD) in the Northern District of California in 2018. PSR ¶ 12; Ex. 21 at 15.

Case No. 4:23-CR-00269-3 (Conspiracy Against Rights):

Beginning in or about 2019, Wenger conspired with fellow Antioch Police Officers Eric Rombough and Morteza Amiri to use excessive force, and also to be able to continue using excessive force. The evidence at trial showed that Amiri, Rombough, and Wenger looked for and even created opportunities to use excessive force; they interceded in one another's uses of force only when necessary to keep the other from getting caught; and they covered up for each other and falsified police records as necessary to ensure that they could continue using excessive force without sanction.

Rombough's testimony, corroborated by text messages and falsified police reports, proved that he and Morteza Amiri had an agreement to use excessive force, an agreement which Devon Wenger joined. Rombough testified that Morteza Amiri shared these views, as expressed in text messages, including one exchange in which he and Amiri discussed violating civil rights. *See* Ex. 102 at p. 2188. Rombough also testified that Amiri vouched for Wenger and told him that Wenger "was not scared to go hands on." Tr. at 595, 659.

The evidence at trial showed that Wenger joined the conspiracy no later than April 21, 2019, when he enlisted Amiri and Rombough's participation in finding and using excessive force on a suspect

---

[1] The facts set forth in this section are drawn from the PSR and the trial records from the two trials in this case.

who ran. On the evening of April 20, 2019, Wenger texted both Amiri and Rombough about a rumor going around APD:

> Normally I would Not give a shit what people think but I really like you guys and I don't want to you to have a negative opinion of me over some bullshit. . .I want to let you guys know that I would not avoid a paper call like some other fuck faces do. . . Thanks dudes, again I'm only texting you two because I like you guys and I sincerely care what you think. If anything like this happens again please let me know. I know how bad opinions of people can spread like wild fire here.

Ex. 107 at 1. Following this text, both Amiri and Rombough texted Wenger to say that they would meet up with Rombough in person later that night. Ex. 103 at 28; Ex. 107 at 2.

Within a few hours of these texts, Wenger texted Rombough and Amiri again, "*Please find this guys and fuck him in the ass*." Ex. 107 at 3 (emphasis added). Rombough wrote back a few seconds later, "Deal." *Id*. To ensure that Amiri and Rombough knew who to look for, a few seconds after that, Wenger texted Amiri and Rombough a photo and booking information for the person and wrote, "He's the fuck face that ran. Wants are 108 and 2800."[2] Ex. 107 at 4; Tr. at 661. Amiri, who was a K-9 handler, responded about 40 minutes later, "[I]ll bite em." Ex. 107 at 5. Rombough testified at trial that he was serious when he said, "deal," and that he took Amiri's statement that he would "bite em" seriously based on their relationship. Tr. at 662-63.

*Purposes of the conspiracy*

The conspiracy had several purposes. One was to impose extrajudicial punishment on suspects. Wenger wrote to Amiri in a text that is discussed further below, "[t]hat's what fucking happens when you run, you acquire a tax." Ex. 255 at 70. Another was sheer entertainment. *See*, *e.g.*, Ex. 255 at 72-73 (in response to Wenger's text of injury photos following "a very eventful work week," Wenger wrote, "Hahahah FUCK YEAH BRO"); Ex. 103 at 16 ("Kyle got in some solid hits and Matt straight spartan kicked that fuck face pretty good lol"); Ex. 515 (video taken after the arrest of Dajon Smith). Another object was potential advancement at APD. Rombough testified that "[w]hen I started using force, I began to get noticed at the P.D." Tr. at 502. And Wenger, after using the less lethal launcher on Dajon Smith, told Amiri that he was "just trying to get on SWAT." Ex. 103 at 295.

---

[2] Rombough testified that 108 refers to a stolen vehicle and 2800 refers to "evading." Tr. at 661.

The following are some additional examples from the trial of Wenger's participation in the conspiracy.

*October 2019: C.Y. and C.*

During an incident in October 2019, Wenger broke victim C.Y.'s arm and smashed her sister C.'s face into the side of a police car. Following the incident, Wenger falsified key details in his police report and in a related report.

While investigating a shoplifting incident, Wenger went to C.Y.'s residence. He walked into the open garage where C.Y. was sitting in her car and asked to speak to her. She stepped out of the car and said that she wanted to get her mother. Wenger wrote in his report that C.Y. started to run towards the residence door after Officer Nilsen told her she was detained. Ex. 651. However, Nilsen testified at trial that this was not true, that she was not really running. Tr. at 1232. Wenger also wrote in his report that he then grabbed C.Y.'s arm and told her to put her hands behind her back, and that she "refused by pulling away from me and tensing her right arm." Ex. 651. C.Y. testified that Wenger grabbed her as soon as she left her car, shoved her against a wall, and broke her arm. Tr. at 268. A later x-ray showed that Wenger had in fact broken her arm. Ex. 668.

The remaining events can be observed on a bystander video that contradicts Wenger's police report narrative of what happened next, and apparently was not collected by APD at the time of the incident. *See* Ex. 669. After Wenger broke C.Y.'s arm, he sat her on a curb in front of the house. Shortly afterwards, C.Y.'s sister C. joined a crowd which was gathering outside the house, carrying some keys on a lanyard. Wenger wrote in his police report that he then twice asked C. whether she was at the Spirit Halloween store, and that instead of answering she turned away from him "as if she might be preparing to flee." Ex. 651. He described "placing her against a parked car" to handcuff her. *Id*. The video shows instead that after Wenger asked C.Y.'s sister once whether she was at the Spirit Halloween Store, he lunged forward and either pushed or attempted to grab her at her chest, causing her to fall into a car and then to the ground.

Wenger also wrote in his report that as he was escorting C. to a patrol car, she attempted to pull away from him and that as a result of her actions she "subsequently fell onto the side of the patrol vehicle." Ex. 651. The video shows what actually happened: that after subduing C. on the ground,

Wenger picked her up, walked her over to a patrol car, grabbed her by the neck, and used the full force of his weight to smash C's face into the side of the car. Ex. 669.

Wenger omitted these details, including the injury to C.'s face, from a report which was required by APD to document uses of force. Ex. 667. He instead described C. as the "Primary Aggressor," and noted that she was charged with Assault with a Deadly Weapon. *Id*. Captain Anthony Morefield also testified that in an early draft of the police report, Wenger had referred to C.'s keys on a lanyard as "a bludgeoning instrument, or bludgeoning weapon, or a blunt force weapon." Tr. at 426.

Rombough testified at trial that Wenger spoke with him about C.Y.'s broken arm afterwards, and told him the "bitch got what she deserved." Tr. at 662.

<u>August 21-23, 2020</u>

On August 21, Wenger, Amiri, and Amiri's K-9 Purcy assisted the neighboring Pittsburg Police Department with tracking a car theft suspect. Together, they tracked the suspect to a stand of bushes, from which K-9 Purcy dragged him out. The incident was captured by a Pittsburg Police Officer's body-worn camera ("BWC"). Ex. 302. Later that night, Amiri texted Wenger, "if pitt didn't have all those body cams and that was us... we would have fucked him up more. he didn't get what he deserved." Wenger responded, "I agree. That's why I don't like body cams." Ex. 255 at 61-64.

The next night, August 22, 2020, at 6:25 PM, Wenger wrote to Amiri: "We need to get into something tonight bro!! Lets go 3 nights in a row dog bite!!!" Ex. 255 at 65. At 6:43 PM, Wenger texted Amiri again: "Lets get faggot ass donleavy something to stress out about lol." *Id*. at 66. Donleavy was an APD lieutenant. A police report shows that seven minutes after this text, Amiri, Wenger, and another officer engaged with a suspect named M.C. whom Amiri knew was the subject of a felony arrest warrant, Ex. 251 at 1. Just a month earlier, Amiri and Rombough had texted about a plan to set up an encounter with M.C. and then assault him. Exh. 102 at p. 2363; Tr. at 629.

The evidence shows that this plan was serious: when Amiri and Wenger caught M.C. on August 22, they punched him in the face, as described further below. *See* Exh. 255 at 66-67 & 141-143; *see also* Exh. 257 (photo of injury). The punches were not reported: in his police report after the incident with M.C., Amiri wrote that he "did not use any use of force other than a takedown during my arrest." Ex. 251 at 9. The severest injury Amiri described was a cut lip. *See id*. Amiri also did not

submit a use of force report for the event.  Tr. at 821-822.

However, subsequent texts and photos exchanged between Wenger and Amiri suggest that rather than or in addition to a "takedown," M.C. was punched in the face until he bled profusely.  At 7:06 PM, sixteen minutes after Wenger's last text, Amiri texted Wenger: "hahaha. [M.C.] style."  Ex. 255 at 66.  Amiri took a photo of M.C.'s face following the incident and sent the photo to Wenger at 12:42 AM the next day.  Ex. 255 at 67; Ex. 257.  In the photo, the left half of M.C.'s face is covered in blood.  Ex. 257.  Amiri also took photos of M.C.'s face at 10:54 PM, almost four hours after the encounter, in which the blood on M.C.'s face had been cleaned up but was scratched and visibly bruised.  *See* Ex. 254.  Text messages between Amiri and Wenger a few months later suggest what actually happened to M.C. on August 22.  Ex. 255 at 140-142.  Amiri advised Wenger that M.C. "took a deal for 16 months state prison for all his cases."  Wenger wrote back, "Fuck yeah dude, that still doesn't seem harsh enough for that scumbag."  And Amiri responded, "Then face punches was the most punishment he got lol."  Wenger replied, "Ha ha ha, fuck that nerd."

The night after the M.C. incident, Amiri and his K-9 Purcy tracked car theft suspect D.R. to a tent in a homeless camp, where Purcy shredded D.R.'s back.  Amiri texted Wenger a photo of D.R.'s back later that night, and wrote, "bro we saw him laying in bed just acting like he was asleep. i walked out the tent and game planned how to fuck him up. went back and did justice. wish you were there. inside a tent with no cams... you would have loved it. oakley agreed to keep cameras off."  Ex. 255 at 70.  Wenger wrote back, "Bro...fuuuuuuck yes!!! Fuck that nerd!! That's what fucking happens when you run, you acquire a tax. His tax was paid properly! Good shit bro."  *Id*. at 71.

At the end of this week, Amiri texted Wenger: "let's fuck some people up next work week," and Wenger agreed, "Fuck to the mother fucking yes."  Ex. 255 at 74-75.

*October 2020:  M.Z.*

In October 2020, Amiri sent the officers on his shift booking photos and information on an individual named M.Z., said M.Z. had stolen his mail, and offered a "bounty" to anybody who found him. Wenger was one of the participants in the group text, and he wrote back to the group: "Lets beat his fucking ass bro! I'm down after work morty."  Ex. 406.  Wenger then wrote privately to Amiri: "I'm serious bro, let's beat that dudes ass after work."  Ex. 103 at 188.  Former APD Officer Matthew

Contreras testified at trial that Amiri, did, in fact, have an encounter with M.Z. that night. Tr. at 1010-1014.

*October 2021: D.S./Unknown Subject on dirt bike*

In or around January 2021, Wenger attended a training on the 40 mm Less Lethal Launcher, a tactical firearm which uses rubber-tipped plastic bullets. Ex. 12 at 4. The associated training materials included a discussion of "target areas," in which the chest area was identified as "Red: Potentially Lethal." Ex. 13 at 21. Rombough, who attended the same training, understood the chest area to be "non-safe" to deploy the 40 mm less lethal device. Tr. at 529. In or around August 2021, Wenger completed an 80-hour firearms instructor training course. Ex. 20. Rombough described Wenger as an "exceptional shot." Tr. at 658.

A few months later, on October 26, 2021, Wenger deployed the 40mm Less Lethal Launcher to shoot car theft suspect D.S. in the chest while D.S. had his hands up at shoulder height. The incident was captured on body-worn camera video taken from multiple angles. After he arrived, Wenger joined other officers already on the scene by taking up a position covering D.S. with his firearm. *See* Exs. 511-515 (officer BWC from the incident). Former APD Officer Shane Cole arrived last and went over to the sergeant on scene to see if he had a 40mm Less Lethal Launcher. Tr. at 1089, 1094-1097. BWC captures Wenger abandoning his defensive position and leaning back to listen in when Cole asked for the 40mm, and then running in front of Cole to get the 40mm before Cole could. *See* Ex. 513, 515. BWC then captures Wenger running to a position closer to D.S. and immediately shooting D.S. in the chest with the 40mm before he finished his required warning announcement. *See* Exs. 511-515.

Wenger was caught on BWC and separately overheard by Cole saying that he wanted to "40," or use the 40mm, before he shot D.S. *See* Ex. 511; Tr. at 1104 (Cole testimony). Although Wenger's own BWC and the BWC of other officers present showed that D.S.'s hands were up at shoulder height at the time that Wenger shot him, Wenger wrote in his report, "[D.S.] did not appear to me to have his hands up." Ex. 501. However, Palma conceded in his trial testimony that D.S.'s hands were up. Tr. at 1168-1169.

Following this incident, Wenger's supervisor J.E. texted him, "You are going to have to justify why you shot him when his hands were raised shoulder height." Wenger wrote back, "be ready for a deescalation and use of force master piece reviewed by both [R.D.] and Palma." Ex. 509. R.D. and Palma were fellow officers; Palma was at the incident and testified as a defense witness at trial. In the police report dated after these texts, despite his statement above about wanting to "40" D.S., Wenger wrote, "I did not want to, nor did I have any desire to bring harm upon [D.S.]." Ex. 501.

In an encounter after the incident, Wenger told Rombough that Rombough would have been "proud" of him. Tr. at 662. Amiri and Wenger also texted after the D.S. incident, with Amiri writing "i love this wenger" and Wenger writing back "Just trying to get on swat bro!" Ex. 103 at 292-294.

Amiri then asked Wenger if he'd been "dusted by a dirt bike" that day. Ex. 103 at 294. Wenger responded that he "was fucking around with that kid trying to get him to wreck." *Id*. at 297. Amiri told him that it had been posted on social media, and Wenger expressed some concern ("Fuck seriously?"). *Id*. at 298. Amiri reassured him that they had identified the subject and "we are gonna fuck him up." *Id*. at 300. Wenger responded with a "love" emoji, and wrote, "haha fuck that kid. Get his ass." *Id*. at 303-304. But then Wenger said, "I hope I don't get in trouble for trying to ghost stop that dude." *Id*. at 305. FBI Special Agent Armando Delgado-Campos explained at trial that a ghost stop was an unsanctioned police activity. Tr. at 1152. Amiri reassured Wenger again: "nahh. [J.E.] won't care. I only told [A.B.]." *Id*. at 305. Aside from Amiri and Wenger, A.B. had also been the only other officer present at the time of the M.C. incident. Ex. 251.

Case No. 23-CR-00268-2 (Conspiracy to Distribute Steroids and Obstruction of Justice):

In about February 2022, Wenger purchased illegal steroids from former Antioch Police Officer Daniel Harris for himself. Tr. at 299. Shortly afterwards, he then agreed with Harris to distribute steroids to one of Wenger's friends, Brendon Mahoney. Tr. at 304. Mahoney explained at trial that Wenger told him that Harris could help him purchase testosterone. Tr. 374–375, and that Wenger had obtained something similar from Harris. Tr. at 375. Mahoney "was interested in purchasing testosterone, and Mr. Harris seemed like the individual that could facilitate that." Tr. at 374.

Wenger then put Harris in touch with Mahoney so that Mahoney could also purchase steroids from Harris. Tr. at 304. After Mahoney contacted Harris and they spoke about testosterone, Tr. at 306,

377, Harris agreed with Wenger to get Mahoney a bottle of testosterone. Tr. at 308. Mahoney assumed that the testosterone "would just come through Devon, Devon and Mr. Harris would figure it out." Tr. at 378. This assumption was buttressed by conversations in which Wenger also told Mahoney that Mahoney would "get [the testosterone] from" Harris. Tr. at 378. Both Harris and Mahoney testified that they assumed that Mahoney would have paid Harris for the illegal steroids through Wenger.

Harris subsequently ordered anabolic steroids from his source. Tr. at 309. On March 2, 2022, Wenger contacted Harris and asked if he could pick up Mahoney's steroids. Tr. at 313, but Harris still had not received the package from his source. Harris then emailed with his source, who explained that the package was "taking longer than expected" and provided Harris with the USPS tracking number. Tr. at 313–314; Exhibit 36-004. A week later, Wenger again contacted Harris and asked if he could pick up Mahoney's steroids. Tr. at 314. Harris responded that the package was still late and sent Wenger the tracking number. Tr. at 314–315; Exhibit 33-007–33-009. Wenger then asked Harris if he could give Mahoney "one of [Wenger's] personal bottles of testosterone" and then get his own supply "replenish[ed]" when the shipment finally arrived. Tr. at 315. The package never arrived. a*Id*.

After placing the order for testosterone, Mahoney continued to communicate with Wenger about the steroids, "what were next steps, where it was, that kind of stuff." Tr. at 379. Mahoney explained that he never received any steroids and did not pay either Harris or Wenger. Tr. at 379. Mahoney's testimony was corroborated by text message exchanges between him and Wenger. PSR ¶ 21.

The package never arrived because it was seized by the U.S. Postal Service. The seized USPS package contained two smaller boxes: one box contained various prescription-type medications, all labeled as having been manufactured by "True Shot Pharmaceuticals." The second box contained "glass vials with three different color caps," Tr. at 211, which Singh suspected contained anabolic steroids, which were Schedule III controlled substances. Tr. at 211. Multiple DEA chemists testified at the trial that substances seized from the package were steroids that were Schedule III controlled substances.

*Destruction of records*

On March 23, 2022, an FBI Special Agent contacted Wenger by phone at around 8:03 a.m., asked Wenger to exit his residence, and told Wenger that there was a search warrant. Tr. at 391–392. Wenger did not exit the residence and refused to tell the FBI where he was. Tr. at 392. Wenger

1  ultimately met investigators about one hour after he had first been contacted—at approximately 9:00
2  a.m.—and provided investigators with his cellular phone. Tr. at 407.

3        A digital forensics expert witness and senior investigator for the Contra Costa District Attorney's
4  Office testified that he was present that day at a parking lot with FBI agents when Wenger's phone was
5  seized and provided to him. Tr. at 440–41. Wenger provided investigators with the passcode, and the
6  phone was placed into airplane mode. Tr. at 442. Investigators then disabled the U1 UWB chip. Tr. at
7  416. While still on site, an FBI agent reviewed a number of Signal conversations on Wenger's phone
8  and noted that while the application's global setting for automatically deleting messages was off, there
9  existed five specific chats that had been set to automatically delete messages. Tr. at 419–20. The digital
10 forensics expert later performed a full file system extraction of the device, Tr. at 443, and then processed
11 the extraction so that he could analyze it. Tr. at 445. The expert testified regarding certain categories of
12 data that, based on his review, had been, in his opinion, deleted from the phone, and testified that
13 "[t]here was, in my opinion, user intervention to delete certain data." Tr. at 490. The deleted items
14 included text messages between Wenger and Harris and text messages between Wenger and Mahoney.
15 Tr. at 449–86. They also included contacts for Mahoney and Harris, including Harris's contact in
16 Venmo, Tr. at 486–87, call logs related to Mahoney, Tr. at 489, and at least one Signal message, Tr. at
17 494.

18       Mahoney testified that in 2023, he contacted Wenger after he had been interviewed by the FBI
19 about Wenger. Tr. at 381. Wenger told Mahoney not to worry, because he had not "done anything
20 wrong" and that the FBI was "only going to know what [Mahoney] tell[s] them." Tr. at 381. Mahoney
21 explained that he "just said okay," but also knew that there were "text messages between" them, and "all
22 of that [was] documented." Tr. at 382.

23      **B.**    **Procedural History**

24       Wenger was charged in two Indictments on August 16, 2023: in Case No. 23-CR-268, with
25 Conspiracy to Distribute and Possess with Intent to Distribute Anabolic Steroids in violation of 21
26 U.S.C. § 846, 841(a)(1) and (b)(1)(E)(i) (Count One) and Destruction, Alteration, and Falsification of
27 Records in Federal Investigations in violation of 18 U.S.C. § 1519 (Count Four); and in Case No. 23-
28 CR-269 with Conspiracy Against Rights in violation of 18 U.S.C. § 241 (Count One), and one count of

U.S. SENTENCING MEMO          10
23-CR-00268 JSW-2; 23-CR-00269 JSW-3

Deprivation of Rights Under Color of Law in violation of 18 U.S.C. § 242 (Count Eight). PSR ¶¶ 1, 4. The two cases were related before this Court.

On April 30, 2025, Wenger was found guilty of Counts One (Conspiracy to Distribute Anabolic Steroids) and Four (Obstruction of Justice) in Case No. 23-CR-268 following a jury trial. PSR ¶ 2.

On September 18, 2025, Wenger was found guilty of Count One (Conspiracy Against Rights) in Case No. 23-CR-269 following a jury trial. *Id.* at ¶ 12.

Sentencing has been consolidated and set for December 2, 2025, before this Court.

**C.   Guidelines Calculation**

The government agrees with the United States Probation Office ("Probation") that the correct calculation of Wenger's Total Offense Level under the Sentencing Guidelines is 31.

The government agrees with Probation's calculations for Group 2 (C.Y.), Group 3 (C.Y.'s sister C.), Group 4 (M.C.), Group 5 (D.R.), and Group 6 (M.Z.).

*Government Objection*

The government notes its objection to the removal of the group concerning D.S. ("D.S. Group") from the final Guidelines calculation, PSR ¶¶ 2-3, although it acknowledges that the inclusion of the group would not affect the final Total Offense Level. Wenger's conduct surrounding the D.S. incident is relevant pursuant to U.S.S.G. § 1B1.3(c), which states that "[r]elevant conduct does not include conduct for which the defendant was criminally charged and acquitted in federal court, *unless such conduct also establishes, in whole or in part, the instant offense of conviction*." (emphasis added). Wenger's acquittal on the separate count of deprivation of rights does not bar consideration of his conduct relating to D.S. to the offense of conviction—that is, conspiracy to violate civil rights, which is a different crime with different elements. The evidence introduced at trial surrounding the D.S. incident went to Wenger's agreement and intent with respect to the conspiracy. That the jury considered this incident in rendering its guilty verdict for the conspiracy is further evidenced by the fact that it requested to examine the 40 mm munition, which was in evidence, during its deliberation *despite* Count 8 having been previously dismissed by the Court. *See* Dkt. No. 597 at 4.

The government calculates that the adjusted offense level for the D.S. Group is 18: a base offense level of 12 (U.S.S.G. § 2H1.1(a)(2)), plus 6 because the offense was committed under color of

law (U.S.S.G. § 2H1.1(b)(1)(B). Because 18 is 9 levels less serious than the group with the highest offense level in Probation's calculation (which has an adjusted offense level of 27), it does not count as a "Unit" under U.S.S.G. § 3D1.4(c). PSR ¶ 96, 97. As a result, including the D.S. group in the Guidelines calculation would not increase the Combined Adjusted Offense Level and Total Offense Level of 31.

*Defense Objections*

The PSR identifies six defense objections, but according to Probation, Wenger in fact "objected to almost the entirety of the offense conduct section contained in paragraphs 24 through 46," PSR Addendum ¶ 6 (Objection Number One).

<u>Amiri's Acquittal</u>. One of Wenger's principal objections, and a premise which runs throughout his sentencing memo, Dkt. 639, is his suggestion that there could be no conspiracy because Amiri was acquitted of conspiracy and Wenger cannot be a co-conspirator. *Id*. at 3 ("Amiri was acquitted of conspiracy; there is, therefore, no evidence that Wenger entered into a conspiracy that could not have existed (based on Amiri's acquittal)").

Not so. The jury has already rendered its verdict: Wenger is guilty of conspiracy. Wenger's co-defendant and co-conspirator Rombough was also convicted of conspiracy by his guilty plea, and Rombough testified at length about the existence and nature of the conspiracy. Wenger himself already conceded, in a motion *in limine*, that "the acquittal may not be introduced as substantive evidence of innocence." Dkt. 463, at 1. While the Constitution's protection against double jeopardy prevents the same defendant from being retried for a variant of the same conspiracy following an acquittal, *see Ashe v. Swenson*, 397 U.S. 436, 446 (1970), no such collateral estoppel principles apply to the trial of co-conspirators, *see, e.g.*, *United States v. Bundy*, No. 2:16-CR-46-GMN-PAL, 2017 WL 4684655, at *2 (D. Nev. Oct. 18, 2017) (holding defendant was not party to initial trial that resulted in acquittal of coconspirators and therefore his "alleged involvement in the conspiracy is still at issue"). To the contrary, "[i]t is well established that a person may be convicted of conspiring with a co-defendant even when the jury acquits that co-defendant of conspiracy." *United States v. Ching Tang Lo*, 447 F.3d 1212, 1226 (9th Cir. 2006) (citing *United States v. Powell*, 469 U.S. 57, 65–66 (1984))*; see, e.g.*, *United States v. Galecki*, 89 F.4th 713, 735 (9th Cir. 2023) ("Defendants assert that Eaton cannot be counted as one of

the five requisite conspirators given that the jury acquitted him on all charges. That is wrong."); *United States v. Baird*, 189 F.3d 475 (9th Cir. 1999) (upholding judgment against defendant where § 241 defendant's co-conspirators had been acquitted or no verdict had been reached); *United States v. Shields*, No. 12-CR-00410-BLF-1, 2020 WL 353550, at *10 (N.D. Cal. Jan. 21, 2020) ("Sims' acquittal on the majority of the counts does not undermine Shields' conviction"). This is because, in part, "the acquittal of all conspirators but one does not necessarily indicate that the jury found no agreement to act." *Ching Tang Lo*, 447 F.3d at 1226 n.8 (*quoting United States v. Valles–Valencia,* 823 F.2d 381, 382 (9th Cir. 1987), *modifying* 811 F.2d 1232 (9th Cir.1987). Wenger is simply incorrect when he argues that Amiri's acquittal affects his guilt or his sentencing exposure.

In his sentencing memo, Wenger also identifies a more specific set of issues, each of which is a narrower version of a defense objection in the PSR, that he believes must be resolved by the Court at sentencing. Dkt. 639 at 12-13. The government responds to each of those specific issues:

Defense Objection Number Two (Count Group 3—C.). Wenger claims that no trial evidence established that C. was injured. *Id*. at 12. C.Y. testified at trial that when Wenger "slammed her head to the back of the car, to the side of the car," Tr. at 276, C. suffered a "busted lip." Tr. at 283. In C.'s written statement to the Court, C. wrote that "Officer Wagner" "slammed my head into his car window." C. Victim Impact Statement. The government agrees with Probation that the three-level adjustment for injury therefore applies. PSR Addendum ¶ 9.

Defense Objection Number Three (Count Group 4—M.C.). Wenger claims that there was no evidence that M.C. was injured. Dkt. 639 at 12. The government agrees with Probation that the "text messages contained graphic photos of blood running down [M.C.]'s face after arrest." PSR Addendum ¶ 11; *see also* Ex. 257. The text messages also contain "cleaned-up" photos of M.C. taken that evening which show his visibly bruised face. *See* Ex. 254. The three-level adjustment for injury therefore applies.

Defense Objection Number Four (Count Group 5—D.R.). Wenger claims that Amiri engaged in this conduct alone, and that because Amiri was acquitted of conspiracy at trial this conduct cannot be part of a conspiracy. The government agrees with Probation that the D.R. incident is indeed part of the conspiracy. PSR Addendum ¶ 13. It took place just two days after Wenger and Amiri agreed that they

would have "fucked up" the Pittsburg car suspect even more if there were no body cams, and one day after Wenger texted Amiri: "We need to get into something tonight bro!! Lets go 3 nights in a row dog bite!!!," after which Amiri and Wenger then encountered M.C. and punched him in the face. The government addresses Wenger's argument regarding Amiri's acquittal on conspiracy—an incorrect premise running through his sentencing argument—above.

Defense Objection Number Five (Count Group 6—M.Z.). Wenger argues that this group should be eliminated because the text messages from Wenger to Amiri were simply "blowing off steam," there was no assault, and there was no co-conspirator given Amiri's acquittal on the conspiracy count. The government agrees with Probation: "The undersigned believes the text messages from the defendant reflect an intent to cause harm to [M.Z.]…and the encounter Amiri had with [M.Z.] later that evening was reasonably foreseeable to the defendant." *Id*. at ¶ 15.

Defense Objection Number Six (Count Group 1—Drug Distribution/Obstruction of Justice). In his sentencing memo, the defendant conceded that he no longer objects to this Guidelines calculation. Although the government disagrees with Probation's calculation for this group, *id*. at ¶¶ 16-17, it acknowledges that the calculation does not affect the ultimate Sentencing Guidelines calculation because this group drops out under U.S.S.G. § 3D1.4(c).

*Calculation of Sentencing Guidelines Range*

As discussed further below, the government agrees with Probation that no acceptance of responsibility adjustment is warranted because "the defendant has not clearly demonstrated acceptance of responsibility for the offense." PSR ¶¶ 101. To the contrary, Wenger has continually raised unfounded accusations about alleged government misconduct in his post-trial actions and submissions instead of accepting any responsibility for his crimes.

Wenger does not have a criminal history, which results in a Criminal History Category of I. Wenger does not qualify for the adjustment for zero-point offenders in drug cases because, pursuant to U.S.S.G. § 4C1.1(a)(8), such an adjustment does not apply to offenses regarding individual rights as here.

The government agrees with Probation's calculation of the advisory sentencing range of **108 to 135 months** of imprisonment.

## III. DISCUSSION

### A. Applicable Law

The Court should impose a sentence sufficient, but not greater than necessary, to reflect the purposes of sentencing that Congress identified in 18 U.S.C. § 3553(a)(2). *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008). The Court should begin the process of determining an appropriate sentence by calculating the correct sentencing range under the Guidelines. *Id.* After determining the appropriate Guidelines calculation, the Court should then evaluate the sentence for substantive reasonableness in light of the factors set out in Section 3553(a). *Carty*, 520 F.3d at 991–93.

Under 18 U.S.C. § 3553(a), in arriving at the appropriate sentence for the defendant, the Court should consider these factors applicable to this case, among others: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need for the sentence imposed to afford adequate deterrence to criminal conduct; (4) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; (5) the need to provide restitution to any victims of the offense.

### B. Recommendation

The government respectfully recommends that the Court sentence Wenger to a Guidelines sentence, followed by three years of supervised release, based upon a consideration of the Guidelines and 18 U.S.C. § 3553(a) factors. A Guidelines sentence should be imposed in this case given that the calculation appropriately accounts for Wenger's betrayal of his position of trust as a police officer, the physical and psychological harm caused to victims by Wenger's conduct, and Wenger's refusal to accept any responsibility for his actions. Such a sentence would be sufficient, but not greater than necessary, based on the nature of the offense, Wenger's history and characteristics, and the need for deterrence.

*The offense conduct*

The government's recommended custodial sentence accounts for the seriousness of Wenger's crimes and the nature and circumstances of the offenses.

As an initial matter, the government urges the Court to account for Wenger's obstruction of

justice and steroid distribution convictions when imposing its sentence, because Wenger's destruction of evidence of illegal steroids on his phone shows his contempt for the law and is entirely consistent with his falsification of police documents to cover up his uses of excessive force.  As described in detail in the United States' Opposition to Defendant's Renewed Motion for Judgment of Acquittal, Dkt. 615 at 10-12, the evidence at trial showed that Wenger made multiple false statements in police reports and use of force reports relating to his encounters with C.Y., C., and D.S.  Wenger's police report narrative relating to C. was contradicted by video captured of the episode.  It seems clear that Wenger felt comfortable lying about his encounter with C. because he believed there was no video; APD did not have body-worn camera at the time, and the bystander videos collected by one of the officers did not include the full video of the incident involving C. that was presented to the jury.  As set forth above, however, Wenger's convictions for conspiring to distribute steroids and for obstructing justice fall out of the Guidelines calculation.  This weighs in favor of the imposition of a sentence within the Guidelines. *See* U.S.S.G. § 3D1.4(c) ("Such Groups will not increase the applicable offense level but may provide a reason for sentencing at the higher end of the sentencing range for the applicable offense level.").

      As to Wenger's participation in the conspiracy to use excessive force, the crime driving the offense level of the Guidelines calculation, the evidence at trial showed that Wenger's behavior was not a one-time aberration.  He conspired with his fellow officers to hurt people, and he carried out his part in the conspiracy over a period of over two years.  In April 2019 he enlisted Amiri and Rombough to do his dirty work, telling them to "find this guy[] and fuck him in the ass;" making sure both that they knew he was serious and that they could find the suspect by sending them the suspect's photograph and booking information. Ex. 107 at 3.  But he didn't stop there.  As the evidence at trial established, he not only hurt members of the community himself, but he agreed with his close confidante Amiri about hurting people in the community, further encouraged Amiri to do so, and cheered when Amiri took action.

      Wenger's actions had significant consequences.  As multiple victims of the conspiracy have told the Court in testimony in both excessive force trials or in written submissions, the conspiracy caused real and lasting physical and psychological harm.  C.Y. testified that her arm has never fully healed after Wenger broke it into two pieces; it still hurts, she can't straighten it fully, and one upper arm bone juts

out unnaturally above her elbow, something she showed the jury. Tr. at 294-295. She wrote in her submission to the Court that she will "forever have this event in my head especially when I come across officers, not knowing w[h]ether I can let my guard down and trust nothing won't happen." *See* C.Y. Victim Impact Statement. To Wenger, she wrote, "I didn't deserve what you did to me and my sister in front of the rest of my family." *Id*. Her sister C. wrote that "going to jail for something I didn't commit was one of the worst days of my life." *See* C. Victim Impact Statement. She described how Wenger "slammed my head into his car window, broke[] my sister arm, and left my family to deal with all the trauma!" *Id*. She cries when she watches video of the incident, and is scared to record something on her phone or to call a police officer. *Id*. She failed her college mid-terms after being wrongfully jailed following the 2019 incident and is still paying off her student loans from that time. *Id*.

*Wenger's history and characteristics*

Wenger's history and characteristics support the government's recommended sentence. Wenger was a public servant sworn to uphold the rule of law. It is from this position of trust that Wenger exacted harm on people in the Antioch community—people who may have had a criminal history or were subject to a warrant, or were suspected of a crime, but did not deserve their civil rights being violated. And it was from this position as a sworn law enforcement officer that he falsified documents and destroyed evidence.

Insightfully, C. observed in her submission to the Court that Wenger did what he wanted to do *because he could*. *Id*. *See* C. Victim Impact Statement. C.Y. testified to thinking the same thing as she watched Wenger grab her sister C.: "I was in pain, and at that point, they was – *he was going to do what he wanted to do.*" Tr. at 281 (emphasis added). In that same vein, the government also points the Court to a clip of the C.Y./C. bystander video which the government believes shows the real Devon Wenger: after he broke C.Y.'s arm, and after he threw C. to the ground and then smashed her face into his police car, Wenger went after another family member who was filming him on her phone from inside the family garage. Ex. 669, at 5:19-5:31. He can be seen on the video suddenly pulling on the garage door and breaking it, and then stalking rapidly towards the woman holding the camera as she backs away and then moves behind a car to get away from him. He turns away and leaves the garage after another officer is heard and seen calling him back. *Id*.

Wenger's statements to Probation indicate he still does not acknowledge the harm he caused and still refuses to take any responsibility for his conduct. Instead, he "is hopeful that his convictions will be overturned on appeal," and "wants to return to active military service and complete his special forces training." PSR ¶ 117.

Similarly, counsel's objections to the facts in the PSR and sentencing memo show that Wenger continues to deny any culpability for his actions, including what is captured on video or in photos or falsely written in a police report. *See*, *e.g.* PSR Addendum ¶¶ 8, 10. He mischaracterizes text messages in which he specifically requests, encourages, or applauds the use of violence against specific members of the community as "offensive hyperbole," "frustration and informal office chatter," (April 2019 texts requesting that Amiri and Rombough find and assault a suspect), Dkt. 639 at 5; "braggadocio" and "ambiguous, colloquial, and reflect[ing] posturing and frustration" (texts to Amiri stating, "We need to get into something tonight bro!! Lets go 3 nights in a row dog bite!!!"), Dkt. 639 at 8-9; PSR ¶ 40; "venting and bravado" (applauding Amiri for attacking D.R., texting "That's what fucking happens when you run, you acquire a tax. His tax was paid properly!"), Dkt. 639 at 10; PSR ¶ 43; and "posturing and venting" (texts to Amiri in a group and privately expressing his seriousness about beating up M.Z.), Dkt. 639 at 10-11, PSR ¶ 45.

Wenger's contempt for the victims of the conspiracy is obvious. He calls C.Y. "a suspect, not a victim," Dkt. 639 at 3, and uses the full names of victims in this public filing rather than masking their identities.

*Deterrence*

The government's recommended sentence would serve as general deterrence to others in positions of public trust—particularly sworn police officers—from committing and covering up such crimes. As this Court may recollect from the pretrial litigation in these related cases, the FBI's investigation into an initially narrower view of police misconduct revealed a multiplying number of crimes at issue. Wenger, with his communications relishing doing harm and exacting extrajudicial punishment on those in the community and attacks on C.Y., C., and others, was among the worst. A meaningful custodial sentence would cause police officers to truly examine the conduct at issue and make sure that their own conduct does not match it. While Wenger presents himself as both an

immature braggart and jokester, and the victim of a vast retaliatory conspiracy, the evidence presented at both trials shows a different story: he was a sworn law enforcement officer who was looking to harm people, who encouraged and applauded other officers who harmed people, who helped to illegally distribute drugs, and who covered up what he did by deleting and falsifying evidence. This was not accident or oversight. An appropriate sentence would spotlight and deter such bad police conduct.

*Sentencing disparities*

Finally, the government's recommended sentence within the Guidelines range is justified when considering the "need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." There are strong parallels between Wenger and his co-defendant and fellow former Antioch police officer Morteza Amiri, who was sentenced to 84 months by this Court (just below the low-end of his Guidelines range of 87-108 months of imprisonment), and Wenger is deserving of no less of a sentence. Wenger and Amiri are both former police officers with identical criminal histories: both are Criminal History I with no convictions at the time of the offense conduct that were convicted of multiple crimes after two trials each. They were, with the exception of one category each (fraud for Amiri, and steroid distribution for Wenger), found guilty of similar conduct. Both were found guilty of obstructing justice, Amiri by falsifying a police report and Wenger by deleting evidence before the FBI seized his phone. Both were also convicted for egregious conduct related to the use of excessive force against citizens of the community they served. And both refused to accept responsibility for any of their conduct, despite the wealth of evidence against each of them. While Amiri was convicted of one count of deprivation of rights and acquitted for his participation in the conspiracy for which Rombough and Wenger were convicted,[3] Wenger's conviction by the jury of conspiracy—for an agreement to violate the civil rights of the people of Antioch—merits the significant Guideline range given the scope and severity of the conspiracy.

The government also recommends a three-year term of supervised release for Wenger with the conditions recommended in the PSR for the purposes of specific deterrence and rehabilitation.

---

[3] The Court considered additional relevant conduct for Amiri, including his racial animus toward individuals in the community, and the government acknowledges that there is no evidence in the record that Wenger held the same animus.

U.S. SENTENCING MEMO                              19
23-CR-00268 JSW-2; 23-CR-00269 JSW-3

### C. Restitution

C.Y. has identified $1,383.50, and C. has identified $210.99, in outstanding school debt as a result of the harm caused to them by Wenger's conduct. *See* addenda to C.Y. and C. Victim Impact Statements. At this time, the government has not received further requests for restitution from the identified victims of Wenger's crimes.

## IV. CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court impose a sentence within the Guidelines range, no less than that imposed for Wenger's codefendant Amiri—specifically, the United States requests a sentence of 108 months of imprisonment, followed by three years of supervised release and the conditions recommended in the PSR.

DATED: November 26, 2025

Respectfully submitted,

CRAIG H. MISSAKIAN
United States Attorney

/s/
ERIC CHENG
ALETHEA M. SARGENT
ALEXANDRA SHEPARD
Assistant United States Attorneys