CRAIG H. MISSAKIAN (CABN 125202)
United States Attorney

JEFF MITCHELL (CABN 236225)
Chief, Criminal Division

ERIC CHENG (CABN 274118)
ALETHEA M. SARGENT (CABN 288222)
Assistant United States Attorneys

　　　450 Golden Gate Avenue, Box 36055
　　　San Francisco, California 94102-3495
　　　Telephone: (415) 436-7200
　　　FAX: (415) 436-7234
　　　Eric.Cheng@usdoj.gov

Attorneys for United States of America

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO.　4:23-CR-00269 JSW-2 |
| Plaintiff, | **UNITED STATES' SENTENCING** |
| v. | **MEMORANDUM AND § 5K1.1 MOTION BASED UPON SUBSTANTIAL ASSISTANCE TO AUTHORITIES** |
| ERIC ALLEN ROMBOUGH, | |
| Defendant. | |

## I.    INTRODUCTION

Upon joining the Antioch Police Department ("APD"), Defendant Eric Rombough betrayed the oath he swore to uphold the law.  He conspired with Morteza Amiri and Devon Wenger to violate, and repeatedly violated, the civil rights of the people of Antioch they swore to protect and serve: they violently dehumanized the population and hurt them as a form of extrajudicial punishment; they celebrated the pain and injuries they inflicted; and they falsified and misrepresented the true facts of incidents in police reports to cover up unconstitutional uses of force.

It is perhaps not too strong to say that Rombough and his coconspirators, given their positions of trust as police officers, took part in devastating a community.  To be clear, the government acknowledges and respects the work of policing as a difficult and often dangerous job, and Antioch, as multiple trials before this Court showed, has been a violent city.  But the last thing the people of Antioch needed was the brutal extrajudicial violence meted out by Rombough and others—officers these people were supposed to trust to protect them.

The government's investigation concerning misconduct among the Antioch and Pittsburg police departments revealed that Rombough's actions and words stood out in particular among the related cases:  Rombough proudly touted his violence, collecting spent shells from deployments of his method of choice for inflicting harm—the 40mm less lethal launcher—as trophies to display on his mantle.  He encouraged and celebrated the cruelty of his co-defendants and others.  And his communications revealed his abhorrent prejudices against minorities in the community (particularly Black people), including with respect to policing them.  Indeed, Rombough's crimes were gravely serious; his conduct was among the worst of the worst.

However, after Rombough was indicted by a federal grand jury in August 2023, his approach to the charges appeared dramatically different than that of his co-defendants.  As the proceedings progressed, it became clear that Rombough wished to acknowledge that what he had agreed to do and in fact had done was wrong, and that he wished to take actual responsibility for his past crimes.  In December 2024, he met with the government, overcome with a desire to set things right.  Rombough decided to plead guilty, which he did on January 14, 2025.  He also agreed to cooperate with the government.  Over hours of discussion over more than half a dozen days of meetings, he spoke

truthfully and completely to confirm his criminality and that of others, including facts about his own conduct that ultimately factored into his Guidelines range calculation.

Ultimately, Rombough testified at length in two jury trials involving each of his co-defendants, across three separate trial days. In both trials, he expressed true regret for his actions, genuine acknowledgement of the deep harm they have had on an individual and collective basis to his victims and the community, and a real desire to model for his children taking complete responsibility for his mistakes. Rombough's testimony confirmed that his and his co-defendants' statements regarding their intent to harm was real, that their concealment of one another's bad deeds was real, and that, in short, their agreement was real. Throughout his testimony, Rombough made repeated, painful admissions about himself and his colleagues, including one of his closest friends.

Based on the nature and circumstances of the serious offenses, the defendant's history and characteristics (including his role as a sworn police officer), and the need to avoid unwarranted sentence disparities given the sentences already imposed by this Court arising out of this conspiracy, the government moves this Court for the equivalent of an eight-level downward departure pursuant to § 5K1.1 and recommends that the Court impose a sentence of 36 months' custody, followed by three years of supervised release, and 100 hours of community service. This proposed sentence is sufficient, but not greater than necessary, to achieve the goals set forth in 18 U.S.C. § 3553(a)(2).

## II.    BACKGROUND

### A.    Factual Background

Rombough was employed as a police officer with the City of Antioch's Police Department (APD) beginning in approximately February 2017, and held assignments on APD's SWAT team, Gang Unit, and Problem-Oriented Policing (POP) team. PSR ¶ 8. Like other Antioch police officers, he swore an oath to uphold and defend the Constitution of the United States and the Constitution of the State of California, and this obligation included holding the rights of those accused of crimes in the same regard as the rights of any other person. PSR ¶ 8.

The Antioch Police Department has a policy governing the use of force by its officers. PSR ¶ 9. The use of force policy sets forth the basic principle that officers "shall use only the amount of force that reasonably appears necessary given the facts and totality of the circumstances known to or perceived by

the officer at the time of the event to accomplish a legitimate law enforcement purpose." *Id.* Multiple current and former Antioch Police officers testified to their familiarity with this core principles regarding the use of force. *Id.* The policy also required that officers notify their supervisors as soon as possible when uses of force caused visible injury, or when a reasonable officer would conclude that the individual may have experienced more than momentary discomfort. *Id.*

Rombough served as an operator of the 40mm less lethal launcher. *Id.* He and other APD officers, including Amiri and Wenger, received training and qualification for the 40mm less lethal launcher, which covered relevant policies, nomenclature and munitions, recommended target areas, announcements, documentation, and other topics. *Id.* Among other things, the training advised that certain areas of the body are "potentially lethal" when targeted by the 40mm less lethal launcher, including the head, neck, chest, groin area, and portions of the back and lower back. *Id.*

Beginning no later than approximately February 2019 and continuing through approximately March 2022, Rombough conspired with Amiri, Wenger, and other APD officers to injure, oppress, threaten, and intimidate residents of Antioch, California. PSR ¶ 10. Rombough's testimony at trial, corroborated by text messages and falsified police reports, proved that he and Amiri had an agreement to use excessive force, an agreement which Wenger later joined. *Id.* Rombough's conduct included the use of the 40mm less lethal launcher, and Amiri's conduct included his deployment of his canine. Rombough testified that after he was hired at the Antioch Police Department, he acquired a certain view of the individuals he policed; both people who made reports and suspects, seeing them as "numbers." *Id.* He came to see calls for help as a waste of time and criminal suspects as not deserving of rights. *Id.* He testified that during the COVID-19 lockdown, this sense increased as he saw people apparently not prosecuted for crimes, and he came to see his own brutality as their punishment. *Id.* He came to relish the fact that he was delivering punishment and took pleasure from the violence. *Id.* Rombough testified that he knew Amiri shared these views and they discussed violating civil rights via text messages. *Id.* Additionally, Amiri vouched for Wenger, telling him that Wenger "was not scared to go hands on." *Id.*

After specific deployments of excessive force, Rombough, Amiri, and Wenger would tout their applications of force to each other. PSR ¶ 13. Following an incident in approximately October 2019 in which Wenger broke a young female subject's arm, Rombough testified that Wenger touted his actions

to Rombough, and stated something to the effect of, "Bitch wouldn't do what I said." *Id.* In approximately October 2021, Wenger deployed the 40mm less than lethal launcher on a subject. *Id.* Rombough testified that Wenger touted his actions to Rombough and stated something to the effect of, "You would've been proud of me." *Id.*

Amiri and Rombough also collected "trophies" following deployments of force and exchanged photographs of subjects' injuries. PSR ¶ 14. In February 2021, Rombough sent photographs of injuries to numerous individuals, stating to one officer, "and another one got 40d" and "Bro so much fun." *Id.* Likewise, after Amiri's canine deployments, he sent Rombough unofficial photographs he had taken of injuries his canine inflicted on subjects. *Id.* One example was in August 2020, when Amiri sent Rombough multiple images of a subject's injuries and stated, "what about an ass whoopin?" *Id.* In conversations with Amiri, Rombough became aware of Amiri's pride for having the most canine bites of all canine handlers at APD. *Id.*

As a further part of the scheme, Rombough and other officers at APD, including Amiri and Wenger, harbored and discussed racial animus and/or bias in relation to their police work, which impacted their approach to policing in an unlawful manner. PSR ¶ 15. In February 2020, Amiri and Rombough exchanged messages about "gorillas" in derogatory reference to Black people and Rombough added, "I can shoot a few on Sunday." *Id.*

As a further part of the scheme, Rombough and other officers at APD, including Amiri and Wenger, authored police reports that contained false or misleading statements, or material omissions, to suggest that the force used was necessary or justifiable, and encouraged one another to do so. PSR ¶ 16. Rombough also became aware that Amiri added false statements to his police reports to provide better "justification" for his canine deployments, particularly in cases in which a deployment was actually unreasonable and inappropriate. *Id.* Moreover, upon learning of each other's participation in incidents involving violent acts that constituted excessive uses of force, included as identified in the Indictment, Rombough and other officers at APD, including Amiri and Wenger, declined to intercede or report the incidents to certain APD superiors, including as required by policy. *Id.* Instead, they encouraged one another to continue the scheme to deprive the individuals in and around Antioch of their constitutional rights. *Id.*

*June 2019 – Bernard Sieps (Group 5)*

In his trial testimony, Rombough stated he was working patrol on a graveyard shift and located a subject, Bernard Sieps, in front of a warehouse that had been known to contain guns and drugs. PSR ¶ 29. He attempted a pedestrian stop, but Sieps ran from the vehicle, drew a pistol from his waistband, and threw it to the side as Rombough was chasing him. Rombough eventually took Sieps into custody and placed him in handcuffs. Rombough testified that Amiri arrived on scene as Rombough was still delivering force (punching) Sieps. *Id.* In Rombough's testimony, he stated that Sieps did not pose a threat at this point as he was in handcuffs, and that Amiri told him to stop because their sergeant was arriving. *Id.* Rombough stated he did not report all of the strikes he delivered to Sieps, and that he struck him "a couple times." He also did not include in his report that those punches were delivered after Sieps was handcuffed. *Id.*

*August 21 and 22, 2020 Incident – Marc Chicklero (Group 1)*

On August 21, 2020, Wenger, Amiri, and Amiri's K-9 Percy assisted the neighboring Pittsburg Police Department with tracking a car theft suspect. PSR ¶ 17. The incident was captured by a Pittsburg Police Officer's body-worn camera (BWC). *Id.* Before they began tracking, Amiri can be heard asking the Pittsburg officer to let him know when the officer was "hot," meaning if the BWC was on. The Pittsburg officer informed Amiri immediately that he was "hot right now." *Id.* Together, they tracked the suspect to some bushes, from which K-9 Percy dragged him out. *Id.* The incident was captured on the Pittsburg officer's BWC. *Id.* Later that night, Amiri texted Wenger, "if pitt didn't have all those body cams and that was us... we would have fucked him up more. he didn't get what he deserved." *Id.* Wenger responded, "I agree. That's why I don't like body cams." *Id.*

The next night, on August 22, 2020, at 6:25 p.m., Wenger wrote to Amiri: "We need to get into something tonight bro!! Lets go 3 nights in a row dog bite!!!" PSR ¶ 18. At 6:43 p.m., Wenger wrote more: "Lets get faggot ass [lieutenant] something to stress out about lol." *Id.* A police report showed that seven minutes after Wenger's last text, Amiri, Wenger, and another officer engaged with a suspect, Marc Chicklero, whom Amiri knew was the subject of a felony arrest warrant. *Id.* Text messages between Amiri and Rombough revealed that they previously planned to assault Chicklero. On July 28, 2020, Amiri wrote to Rombough, "I was hoping we could set up a dog bite and fuck him up." *Id.*

Rombough replied: "Ok bro. I'm gonna try to catch him rolling." *Id.* In his trial testimony, Rombough stated that he believed that Amiri's statement hoping to set up a dog bite was that they would frame Chicklero, get him into a vehicle, have a pursuit, and potentially use a canine. *Id.*

In his police report after the incident with Chicklero, Amiri wrote that he "did not use any use of force other than a takedown during my arrest." PSR ¶ 19. The most severe injury Amiri described was a cut lip. Amiri also did not submit a use of force report for the event. *Id.* However, subsequent texts and photos exchanged between Wenger and Amiri suggest that rather than or in addition to a "takedown," the officers punched Chicklero in the face until he bled profusely. *Id.* At 7:06 p.m. on August 22, 2020, sixteen minutes after Wenger's last text, Amiri texted Wenger: "hahaha. chicklero style." *Id.* Amiri took a photo of Chicklero's face following the incident and sent the photo to Wenger at 12:42 a.m. the next day. In the photo, the left half of Chicklero's face is covered in blood. *Id.*

Text messages between Amiri and Wenger from November 2020 revealed what happened during the incident with Chicklero on August 22, 2020. PSR ¶ 20. Amiri advised Wenger that Chicklero "took a deal for 16 months state prison for all his cases." *Id.* Wenger wrote back, "Fuck yeah dude, that still doesn't seem harsh enough for that scumbag." And Amiri responded, "Then face punches was the most punishment he got lol." *Id.* Wenger replied, "Ha ha ha, fuck that nerd." *Id.* The police report authored by Amiri following the incident did not reference face punches, and despite the injuries to Chicklero's face, Amiri did not write a use of force report, despite the department's policy which required a force report for visible injury. *Id.* There was no evidence that Wenger reported the use of excessive force as required by the department's policy. *Id.*

*March 2021 Incident – Trent Allen (Group 2)*

During a March 2021 arrest of Trent Allen, Rombough kicked Allen in the head and texted others that his foot hurt because he had kicked Allen's head "like a field goal" and "tr[ied] to kick [Allen's] head over the fence." PSR ¶ 16. He also referred to Allen using a racial slur. *Id.* Rombough did not include this use-of-force in his police report, even though he was required to do so pursuant to APD policy. *Id.* He admitted at trial that he believed he and his co-conspirators "could have got away with anything in the backyard [because] there was no cameras." Trial Tr. p. 656.

*May 5, 2021 Incident – Larry Reed (Group 3)*

On May 5, 2021, Rombough willfully deployed excessive force when he shot Larry Reed with a 40mm less lethal launcher during a patrol call regarding a residence in Antioch. PSR ¶ 21. He learned upon arrival that the call concerned trespassing, which is not a serious crime, by potential transients. *Id.* From outside of a room, Rombough observed Reed and a female laying on a bed inside a room. *Id.* Neither responded to verbal commands, and Reed's hands were by his sides. Rombough saw a bottle laying near Reed, and knew it was not an immediate threat to him, but later referenced it as a reason to deploy the 40mm less lethal launcher. *Id.* Rombough shot Reed in the chest, even though he knew deploying it at someone's chest could be potentially lethal. *Id.* Reed was knocked off the bed and sustained bodily injury. *Id.*

Following the incident, Rombough authored a police report that differed from the accounts that other APD officers later provided. PSR ¶ 22. Rombough later stated that he deployed the 40mm less lethal launcher because Reed was refusing commands and pretending to be asleep while a liquor bottle was next to him. *Id.*

Shortly thereafter, Amiri sent a video to Timothy Allen Manly Williams via Instagram captioned "Officer damages private property while executing a search warrant" of an unknown uniformed police officer looking around, then repeatedly slamming a door into the side of a car parked inside of a private garage. PSR ¶¶ 23-24. Their exchange followed:

> Amiri: why do i think of rombough when i see this?
>     [video]
> Williams: Bro a 100%
>     He 40'd another person today
> Amiri: deserved?
> Williams: No
> Amiri: jesus lol
> Williams: Bro we just shook our heads like wtf .. we assisted patrol on a 6026
> Amiri: no way lol
>     did he at least sit on the dude?
> Williams: It was stupid I know the patrol guys really didn't want any paper work out of it

PSR ¶ 24.

Despite Amiri's conversation with Williams about Reed not "deserving" to get shot by Rombough with a 40mm less lethal launcher, the next day, on May 6, 2021, at about 1:56 p.m., Amiri

sent Rombough a screenshot of another conversation containing a photograph of the two officers and Amiri wrote, "this pic depicts true love." PSR ¶ 25.

*August 24, 2021 Incident – Jessie Lee Wilson (Group 4)*

On August 24, 2021, APD officers, including Amiri and Rombough, executed a search warrant at a residence in Antioch. Multiple individuals exited the residence after officers made announcements. PSR ¶ 26. Officers then entered and located Wilson inside a locked bedroom, holding a video game controller and sitting on an air mattress. *Id.* Wilson removed a pair of headphones and raised his hands as officers, including Rombough entered the room. *Id.* One officer stepped onto the bed and took one of Wilson's arms to arrest him, and as the officer and Wilson leaned forward, Rombough deployed the 40mm less lethal launcher. *Id.* Wilson was struck along his side and lower back, which caused him bodily injury. Rombough knew that deploying the less lethal launcher at someone's lower back could be potentially lethal. *Id.* After Rombough already deployed the less lethal launcher, another officer repeatedly called out, "What's he reaching for;" however, Rombough does not recall seeing Wilson reach for anything. *Id.*

Rombough later contacted an individual identified in the Indictment as "Officer-15" and asked for photos of the incident. PSR ¶ 27. "Officer-15" wrote, "black tip tattoo," under the photo, to which Rombough responded, "Lmao." *Id.*

On September 20, 2021, a sergeant identified as "Officer-12" wrote to Rombough, "You write that he didn't comply, but he clearly had his hands up at first. You need to describe way better what happened. He was ordered to put his hands on his head. He didn't do this. What did he do instead? (Leaned to his right. Arm appeared to be reaching behind bed once [Officer-4] grabbed him)." PSR ¶ 28. Rombough then authored a police report that differed from the accounts that other APD officers later provided. *Id.*

**B.    Procedural History**

Rombough was charged in an Indictment on August 16, 2023 with violations of 18 U.S.C. § 241 – Conspiracy Against Rights (Count One); 18 U.S.C. § 242 – Deprivation of Rights Under Color of Law (Count Six); and 18 U.S.C. § 242 – Deprivation of Rights Under Color of Law (Count Seven).

On January 14, 2025, Rombough pleaded guilty to all counts of the Indictment. Judgment and Sentencing is currently set for March 24, 2026, at 1:00 p.m., before the Honorable Jeffrey S. White, Senior United States District Judge.

### C. Criminal History

Rombough has no previous arrests and does not have criminal convictions resulting in any Criminal History Points, placing him in Criminal History Category I. *See* PSR ¶¶ 83–84.

### D. Guidelines Calculation

The government agrees with the Sentencing Guidelines calculation of the United States Probation Office, prior to any motion by the government under § 5K1.1. PSR ¶¶ 35-79.

In sum, the base offense level of Count Group 1 is 14, pursuant to U.S.S.G. § 2H1.1(a)(1) and U.S.S.G. § 2A2.2(a), a three-level enhancement pursuant to U.S.S.G. § 2A2.2(b)(3)(A) applies because the victim sustained bodily injury, and a six-level enhancement pursuant to U.S.S.G. § 2H1.1(b)(1)(B) applies because the offense was committed under color of law.

The base offense level of Count Group 2 is 14, pursuant to U.S.S.G. § 2H1.1(a)(1) and U.S.S.G. § 2A2.2(a), a three-level enhancement pursuant to U.S.S.G. § 2A2.2(b)(3)(A) applies because the victim sustained bodily injury, and a six-level enhancement pursuant to U.S.S.G. § 2H1.1(b)(1)(B) applies because the offense was committed under color of law.

The base offense level of Count Group 3 is 14, pursuant to U.S.S.G. § 2H1.1(a)(1) and U.S.S.G. § 2A2.2(a), a four-level enhancement pursuant to U.S.S.G. § 2A2.2(b)(2)(B) applies because a dangerous weapon was used, a three-level enhancement pursuant to U.S.S.G. § 2A2.2(b)(3)(A) applies because the victim sustained bodily injury, and a six-level enhancement pursuant to U.S.S.G. § 2H1.1(b)(1)(B) applies because the offense was committed under color of law.

The base offense level of Count Group 4 is 14, pursuant to U.S.S.G. § 2H1.1(a)(1) and U.S.S.G. § 2A2.2(a), a four-level enhancement pursuant to U.S.S.G. § 2A2.2(b)(2)(B) applies because a dangerous weapon was used, a three-level enhancement pursuant to U.S.S.G. § 2A2.2(b)(3)(A) applies because the victim sustained bodily injury, and a six-level enhancement pursuant to U.S.S.G. § 2H1.1(b)(1)(B) applies because the offense was committed under color of law.

The base offense level of Count Group 5 is 14, pursuant to U.S.S.G. § 2H1.1(a)(1) and U.S.S.G.

§ 2A2.2(a), a three-level enhancement pursuant to U.S.S.G. § 2A2.2(b)(3)(A) applies because the victim sustained bodily injury, and a six-level enhancement pursuant to U.S.S.G. § 2H1.1(b)(1)(B) applies because the offense was committed under color of law.

Following a multiple count adjustment, the Combined Offense Level is 31, and a three-level reduction pursuant to U.S.S.G. § 3E1.1(a) & (b) applies based on Defendant's Acceptance of Responsibility.

An offense level of 28 with a Criminal History Category I yields an advisory sentencing range of **78 to 97 months** of imprisonment, prior to any motion by the government under § 5K1.1.  PSR ¶ 114.

**E.     Timeline of Convictions and Sentencings in Related Antioch & Pittsburg Cases**

The status of this Court's sentencing of the defendants in these related cases is as follows:

- Timothy Manly Williams – pleaded guilty on November 28, 2023, sentenced to probation following the government's motion under § 5K1.1 for his substantial assistance to authorities, 100 hours of community service;

- Samantha Peterson – pleaded guilty on January 9, 2024, sentenced to time served, 3 years of supervised release, 100 hours of community service;

- Patrick Berhan – pleaded guilty on March 26, 2024, sentenced to 30 months of custody, 2 years supervised release;

- Ernesto Mejia-Orozco – pleaded guilty on June 11, 2024, sentenced to 3 months of custody, 3 years of supervised release, 100 hours of community service;

- Brauli Jalapa Rodriguez – pleaded guilty on June 25, 2024, sentenced to 3 months of custody, 3 years supervised release, 100 hours of community service;

- Amanda Theodosy/Nash – pleaded guilty on July 30, 2024, sentenced to 3 months of custody, 3 years supervised release, 50 hours of community service;

- Morteza Amiri – convicted at trial on August 8, 2024, and on March 14, 2025, sentenced to 84 months of custody, 3 years supervised release;

- Daniel Harris – pleaded guilty on September 17, 2024, sentenced to time served following the government's motion under § 5K1.1 for his substantial assistance to authorities, 3 years of supervised release, 100 hours of community service;

- *Eric Rombough – pleaded guilty on January 14, 2025, sentencing pending;*
- Devon Wenger – convicted at trial on April 30, 2025, and on September 18, 2025, sentenced to 90 months of custody, 3 years supervised release.

**III.    DISCUSSION**

**A.    Applicable Law**

The Court should impose a sentence sufficient, but not greater than necessary, to reflect the purposes of sentencing that Congress identified in 18 U.S.C. § 3553(a)(2).  *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008).  The Court should begin the process of determining an appropriate sentence by calculating the correct sentencing range under the Guidelines.  *Id.*  After determining the appropriate Guidelines calculation, the Court should then evaluate the sentence for substantive reasonableness in light of the factors set out in Section 3553(a).  *Carty*, 520 F.3d at 991–93.

Under 18 U.S.C. § 3553(a), in arriving at the appropriate sentence for the defendant, the Court should consider these factors applicable to this case, among others:

> (1)    the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2)    the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (3)    the need for the sentence imposed to afford adequate deterrence to criminal conduct;
>
> (4)    the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> (5)    the need to provide restitution to any victims of the offense.

Under U.S.S.G. § 5K1.1, upon motion of the government stating that the defendant has provided substantial assistance in the investigation or prosecution of another person who has committed an offense, a sentence that is below the otherwise applicable guideline range may be appropriate.  The appropriate reduction shall be determined by the court for reasons stated that may include, but are not limited to, consideration of the following:

> (1)    the court's evaluation of the significance and usefulness of the defendant's assistance, taking into consideration the government's evaluation of the assistance rendered;

(2)   the truthfulness, completeness, and reliability of any information or testimony provided by the defendant;

(3)   the nature and extent of the defendant's assistance;

(4)   any injury suffered, or any danger or risk of injury to the defendant or his family resulting from his assistance; and

(5)   the timeliness of the defendant's assistance.

**B.   Substantial Assistance to Authorities and Motion for Variance Under § 5K1.1**

The government moves the Court pursuant to § 5K1.1 for a variance that is the equivalent of an eight-level downward departure based on Rombough's substantial assistance to authorities.[1]

In August 2023, the grand jury returned indictments charging Rombough, his two co-defendants, and multiple other defendants in several related cases.  In mid-2024, a trial date was set for this case involving civil rights violations by Rombough and co-defendants Amiri and Wenger.  Around that time, approximately a year after indictment, it appeared that Rombough was taking a different approach than his co-conspirators.  In late October 2024, Rombough's counsel informed the government that Rombough wished to resolve the matter.  Rombough met with the government to proffer in December 2024 and January 2025, and on January 9, the parties set a change of plea hearing for January 14, 2025.  In addition to the unlawful conduct specifically set out in the Indictment, Rombough's admissions in his plea agreement included corroboration of further misconduct as well.  In advance of two trials before this Court, Rombough met with the government on multiple dates in February 2025, in March 2025, and multiple dates in September 2025.

---

[1] Although departures have been removed from the Sentencing Guidelines as of the 2025 amendments, including with respect to § 5K1.1, the government's motion is still made in the familiar context of a "departure" to be officially implemented as a variance, given that the Guidelines describe the intent of the change to actually be "outcome neutral."  *See* U.S.S.G. § 1 ("The Commission sought to make these changes to better align the requirements placed on the court and acknowledge the growing shift away from the use of departures provided for within the Guidelines Manual in the wake of *Booker* and subsequent decisions. **The Commission envisioned and framed this 2025 amendment to be outcome neutral.**  As such, the removal of departures from the Guidelines Manual does not reflect a determination by the Commission that the rationale underlying the deleted departure provisions is no longer informative or that a court should no longer consider such facts for purposes of determining the appropriate sentence.  **The removal of departures does not limit the information courts may consider in imposing a sentence and it is the Commission's intent that judges who would have relied upon facts previously identified as a basis for a departure will continue to have the authority to rely upon such facts to impose a sentence outside of the applicable guideline range as a variance** under 18 U.S.C. § 3553(a)." (emphases added)).

Rombough testified for approximately twelve hours through the March and September jury trials, across three separate trial days. This testimony was very significant. Rombough and his co-defendants were charged with civil rights violations based on substantial evidence: text messages discussing a desire to do harm and recounting harms done; police reports that were inconsistent with those texts; and the expected testimony of victims. The government still anticipated facing various arguments at trial despite that substantial evidence. First, most of the misconduct took place prior to APD having body-worn camera to record the incidents. Second, the defendants' *modus operandi* included documenting embellishments or excuses for using force in police reports that were intended to meet constitutional requirements for reasonableness on paper. Third, percipient officers were often unwilling to say anything to undermine a defendant's conduct or the police reports as written. Fourth, the victims, with some exceptions, often had significant criminal records or were under suspicion of serious crimes. Fifth, the defenses at trial included that policing was a difficult and dangerous job, and that the defendants' text messages were not literal, but jokes meant only to blow off steam.

In the face of these challenges, Rombough's testimony in each trial provided context and insight to the jury from someone within the conspiracy regarding the evidence presented at trial, helping to show directly what other evidence presented circumstantially: that the defendants' statements regarding their intent to harm was real, that their concealment of one another's bad deeds was real, that, in short, their agreement was real. At the close of the March trial, the jury convicted Amiri of a substantive count of deprivation of rights under color of law and falsification of records, and at the close of the September trial the jury convicted Wenger of conspiracy.

Rombough was truthful, complete, and reliable in his account. Through his testimony in the first trial, Rombough made repeated painful admissions about himself and the person who at the time of the incidents he viewed as his closest friend at APD, Morteza Amiri. During the first trial, he did so while sitting across the courtroom from that friend. Although Rombough's relationship with Wenger was different, his communications with Amiri were so similar to Wenger's own communications with Amiri that his testimony offered potential insight into many messages between Wenger and Amiri as well. And Rombough told those truths with the full knowledge that he would be held accountable for them. Take, for example, the case of Bernard Sieps. Rombough admitted to the government and then testified

under oath about striking Sieps after he was handcuffed, even though the incident was not specifically identified as a substantive charge in the Indictment.  This was important testimony, because he also explained that Amiri saw him, warned him to stop, and did not report his late strikes, which were all acts in furtherance of the conspiracy.  This incident is incorporated into Rombough's Guidelines calculation.  Through such acknowledgments as this, it became apparent to the government that, to Rombough, the truth was what was important.

Rombough's assistance was extensive.  In advance of the two jury trials at which he testified, Rombough met with the government numerous times.  He was available whenever necessary.  He testified for approximately six hours at the March trial, and then he testified again in the September trial.

Rombough took risks by cooperating with the government.  The government believes that Rombough's cooperation and truthful testimony in the trial of two other police officers is a factor to be taken seriously into consideration in his sentencing.  Following Amiri's convictions at his second trial, the government presented evidence to this Court that Amiri was a danger to the community in part based on his volatile and threatening behavior toward his police leadership and others he viewed as having wronged him.  Although Amiri is in custody, Rombough could have fallen into this category as well given his testimony during Amiri's trial.  It is also important to recognize how difficult Rombough's cooperation here was, and not just because he testified against his closest friend at APD.  He testified more broadly about a problematic culture of policing while maintaining his own responsibility and holding back nothing about himself, recounting in detail his own hideous actions and sentiments.  Each of those things separately should be encouraged to the utmost.

Based on Rombough's cooperation and substantial assistance to authorities as set forth above, the government moves this Court for a variance that is the equivalent of an eight-level downward departure pursuant to § 5K1.1.  This downward variance would result in an offense level of 20, which with a Criminal History Category I yields an advisory sentencing range of **33 to 41 months** of imprisonment.

### C.      Recommendation

The government respectfully recommends that the Court impose a sentence of 36 months of custody—within the post-departure Guidelines range, near the low end—followed by three years of

supervised release and 100 hours of community service, based upon a consideration of the Guidelines and 18 U.S.C. § 3553(a) and § 5K1.1 factors. This recommended Guidelines sentence would be appropriate given this Court's prior sentencings of other defendants and would be sufficient, but not greater than necessary, based on the nature and circumstances of the serious offenses and Defendant's history and characteristics.

Rombough's history and characteristics support the government's recommended sentence. He was a public servant sworn to uphold the rule of law and to make the streets *safer* for the community. It is from this position that Rombough—instead of making the streets safer—became a menace to the public like the suspects he sought out. As described above, Rombough's crimes were gravely serious. At the time, Rombough was proud to tout his unjustified violence, and celebrated that of his co-defendants and others as well. Perhaps most sinister, he harbored prejudices against minorities in the community (particularly Black people), which influenced and affected his work as a police officer enforcing the law.

The government's recommended custodial sentence would serve as general deterrence to others in positions of public trust, particularly sworn police officers, from taking the law into their own hands to mete out extrajudicial and unlawful punishment. As with the other defendants in these related cases, this Court's sentence should be imposed accordingly to send a message to those who also may be tempted to commit such crimes. To further assist the Court's consideration of sentencing parity and disparity, the government has, above, detailed for the Court all prior sentences in these related cases.

With all of this in mind, the government has recommended a meaningful custodial sentence with a very significant downward variance to account for Rombough's post-offense conduct and cooperation. Rombough should be credited for approaching the government with, first, a desire to plead guilty, and, second to that, a desire to cooperate. He has expressed true regret for his actions, genuine acknowledgement of the deep harm they have had on an individual and collective basis to his victims and the community, and a real desire to model for his children taking complete responsibility for his mistakes. His testimony laid out his horrific crimes in a way of setting an example to act with honor, and that honor *is* admitting, not hiding, the harms one has caused. And it contributed key insight at the trials concerning Amiri's, and later Wenger's, brutal violations of citizens' right to be free from

excessive force.

Finally, the government recommends that the Court order a three-year term of supervised release for with the conditions recommended in the PSR, as well as with the same 100 hours of community service that this Court also required of other defendants including Peterson, Mejia-Orozco, Jalapa Rodriguez, Manly Williams, and Harris.  The expanded suspicionless search condition agreed to by the parties is appropriate to serve the interests of specific deterrence and rehabilitation given Defendant's use of electronic devices and wire communications in his crimes.

### D.        Restitution

The government received a request for restitution from victim Larry Reed in an amount of **$3,308** for his lost wages and expenses as a result of Rombough's conduct.  The parties have agreed that this amount is appropriate, and the Court has permitted Rombough to pay this amount to the Clerk of Court prior to the issuance of any judgment.  Dkt. No. 684.  The government has not received further requests for restitution at this time.

## IV.    CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court impose a sentence of 36 months of imprisonment, with restitution of $3,308 to Larry Reed, followed by three years of supervised release with the agreed-upon expanded suspicionless search condition and other conditions recommended in the PSR, and 100 hours of community service.

DATED:  March 17, 2026

Respectfully submitted,

CRAIG H. MISSAKIAN
United States Attorney


            /s/
ERIC CHENG
ALETHEA M. SARGENT
Assistant United States Attorneys