CRAIG H. MISSAKIAN (CABN 125202)
United States Attorney

JEFF MITCHELL (CABN 236225)
Chief, Criminal Division

ERIC CHENG (CABN 274118)
Assistant United States Attorney

450 Golden Gate Avenue, Box 36055
San Francisco, California 94102-3495
Telephone: (415) 436-7200
FAX: (415) 436-7234
Eric.Cheng@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>DEVON CHRISTOPHER WENGER,<br><br>Defendant. | Case No. 23-CR-00269 JSW-3<br><br>**UNITED STATES' RESPONSE TO DEFENDANT'S MOTIONS FOR AN INDICATIVE RULING AND A NEW TRIAL**<br><br>Re: Dkt. Nos. 725, 726, 730<br><br>Hearing Date: September 8, 2026<br>Hearing Time: 9:00 a.m.<br>Courtroom: 5, 2nd floor<br><br>Hon. Jeffrey S. White |

The government respectfully responds to Defendant Devon Wenger's motion for an indicative ruling and opposes his motion for a new trial. Fed. R. Crim. P. 33(b)(1) & 37(a). In his Memorandum, Wenger contends that "newly discovered" evidence—a psychiatric evaluation submitted by counsel for codefendant Eric Rombough in March 2026 in advance of Rombough's sentencing hearing (Dkt. No. 692-1)—allegedly "renders Rombough's trial testimony totally incredible." Memo. at 1. To the contrary, the psychiatric evaluation is consistent with Rombough's trial testimony in both March and September 2025 trials.

Tellingly, Wenger's Memorandum centers on a fatally flawed argument: that Rombough's testimony about the conspiracy somehow should not be believed because "for much of the conspiracy period, Rombough was [redacted] from December 10, 2021 onwards." Memo at 12. But this argument fails to recognize that the events described in Rombough's testimony about the conspiracy at the Antioch Police Department (APD)—the descent into corruption, the frustration and dealing out of punishment, and the trust with codefendant Morteza Amiri and Wenger about using excessive force—took place *before* the December 10, 2021 shooting incident in Antioch, an incident that Rombough testified deeply affected him and became a turning point in his life that helped him reflect on his actions.

To the extent there is any arguably new evidence in Rombough's psychiatric evaluation, by no means has Wenger shown that the information (1) is material to the issues at trial; (2) is not cumulative nor merely impeaching; and (3) indicates that a new trial would probably result in acquittal, as required by law to satisfy Rule 33. As Wenger's appeal is pending, this Court should issue an indicative ruling denying Wenger's motion for a new trial.

## I. BACKGROUND

### A. Procedural Background

Wenger was charged in two Indictments on August 16, 2023: in Case No. 23-CR-268, with Conspiracy to Distribute and Possess with Intent to Distribute Anabolic Steroids in violation of 21 U.S.C. § 846, 841(a)(1) and (b)(1)(E)(i) (Count One) and Destruction, Alteration, and Falsification of Records in Federal Investigations in violation of 18 U.S.C. § 1519 (Count Four); and in Case No. 23-CR-269 with Conspiracy Against Rights in violation of 18 U.S.C. § 241 (Count One), and one count of

Deprivation of Rights Under Color of Law in violation of 18 U.S.C. § 242 (Count Eight). The two cases were related before this Court.

On March 3, 2025, Wenger and Amiri proceeded to trial together in Case No. 23-CR-269. On March 5, 2025, the Court granted Wenger's motion for a mistrial and severed his case from Amiri. Dkt. No. 350. Following the trial, the jury found Amiri guilty of two counts, but acquitted Amiri on Count One (Conspiracy Against Rights).

On April 30, 2025, Wenger was found guilty of Counts One (Conspiracy to Distribute Anabolic Steroids) and Four (Obstruction of Justice) in Case No. 23-CR-268 following a jury trial.

On September 18, 2025, Wenger was found guilty of Count One (Conspiracy Against Rights) in Case No. 23-CR-269 following a jury trial. Dkt. No. 595.

Wenger's sentencing was consolidated between Case Nos. 23-CR-268 and 23-CR-269, and held on December 2, 2025 before this Court. Dkt. No. 601. The Court sentenced Wenger to 90 months of imprisonment. Dkt. No. 643. The judgment was entered on December 8, 2025, and Wenger timely appealed on the same date. Dkt. Nos. 644, 646.

On July 20, 2026, Wenger moved the Court of Appeal for the Ninth Circuit for a stay so that he could seek an indicative ruling on a Rule 33 motion to the district court for a new trial based on "newly discovered evidence," and for unrelated relief related to the unsealing of sealed documents that he claims should not have been sealed. *United States v. Wenger*, Nos. 25-7701 & 25-7704 (9th Cir.) Dkt. No. 13. The Ninth Circuit denied Wenger's requested stay. *Id.*, Dkt. No. 18. Wenger's consolidated opening brief is currently due August 28, 2026, following an extension of 120 days from the initial deadline of March 27, 2026 and an extension of 32 days following the Ninth Circuit's order regarding Wenger's requested stay. *Id.*, Dkt. Nos. 5, 11, 12, 18.

Wenger is currently serving his custodial sentence at Jesup FCI, with a projected release date of December 16, 2031. https://www.bop.gov/inmateloc/ (Register No. 10808-506).

**B. Legal Standards**

Under Federal Rule of Criminal Procedure 37(a), "[i]f a timely motion is made for relief that the court lacks the authority to grant because of an appeal that has been docketed and is pending, the court may (1) defer considering the motion; (2) deny the motion; or (3) state either [(i)] that it would grant the

motion if the court of appeals remands for that purpose or [(ii)] that the motion raises a substantial issue." The Rule "allow[s] a district court to deny a motion on the merits while an appeal is pending." *See United States v. Belcher*, No. 18-10133, 2021 WL 2072730 (9th Cir. May 24, 2021).

Under Federal Rule of Criminal Procedure 33, a court "may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). "Rule 33 motions are generally disfavored." *See United States v. Barama*, No. 19-CR-00463-RS-2, 2023 WL 2530994, at *2 (N.D. Cal. Mar. 14, 2023). A "motion for new trial is directed to the discretion of the judge" and "should be granted only in exceptional cases in which the evidence preponderates heavily against the verdict." *United States v. Pimentel*, 654 F.2d 538, 545 (9th Cir. 1981) (internal quotations removed). The defendant "bears the burden of providing that he is entitled to a new trial under Rule 33, and before ordering a new trial pursuant to Rule 33, a district court must find that there is a real concern that an innocent person may have been convicted." *Barama*, 2023 WL 2530994.

A defendant seeking a new trial based on newly discovered evidence must prove each of the following five factors:

"(1) the evidence must be newly discovered;

(2) the failure to discover the evidence sooner must not be the result of a lack of diligence on the defendant's part;

(3) the evidence must be material to the issues at trial;

(4) the evidence must be neither cumulative nor merely impeaching; and

(5) the evidence must indicate that a new trial would probably result in acquittal."

*United States v. Harrington*, 410 F.3d 598, 601 (9th Cir. 2005). "This five-prong test is difficult to meet." *United States v. Steel*, 759 F.2d 706, 713 (9th Cir. 1985). Newly discovered evidence is merely impeaching unless it is "so powerful that, if it were to be believed by the trier of fact, it could render the witness' testimony totally incredible." *United States v. Davis*, 960 F.2d 820, 825 (9th Cir. 1992).

**C. Rombough's Trial Testimony**

During the September 2025 trial, Rombough testified that after he came to APD, he acquired a certain view of the individuals he policed, both people who made reports and suspects, seeing them as "numbers." *See, e.g.*, Tr. 500. He came to see calls for help as a waste of time and suspects as not

deserving of rights. *Id.* He came to resent their rights. *Id.* During the COVID lockdown, this sense increased as he saw people let off for crimes, and he came to see his brutality as their punishment. *Id.* at 501.

Rombough also testified to another reason to use force: potentially advancing in the department. He testified that "[w]hen I started using force, I began to get noticed at the P.D." Tr. at 502. He came to relish the fact that he was delivering punishment and to take pleasure from the violence. In his view, for example, tasing was not the same as "beating" a suspect's "ass" because "once the taser is done and he's in custody, it's over." Tr. 634.

Rombough knew that Amiri and Wenger shared these views; he trusted Amiri, who vouched for Wenger. *See, e.g., id.* at 510. Rombough even testified to a specific text message in which he and Amiri discussed violating civil rights. *See id.* at 514–15; Exh. 102 at p. 2188. Rombough testified that he chose how to behave incident-by-incident based on whether the officers on scene, including Amiri, were people he trusted to keep his secrets. Tr. at 575.

In or around February 2019—the alleged starting point of the conspiracy—when Amiri still had not gotten his first bite, Rombough began working with other officers to ensure that Amiri's K9 bit a suspect, and Rombough was present for Amiri's first bite. Tr. 613-619 & 748.

Months later, on April 21, 2019, Wenger requested that Rombough and Amiri use force against a particular person who, he claimed, had run, and he included the suspect's photograph and booking information. Wenger wrote: "Please find this guys and fuck him in the ass." Exh. 107 at 3. Rombough wrote back a few seconds later, "Deal." *Id.* To ensure that Amiri and Rombough knew who to look for, a few seconds after that, Wenger texted Amiri and Rombough a photo and booking information for the person and wrote, "He's the fuck face that ran. Wants are 108 and 2800." Exh. 107 at 4; Tr. at 661. Amiri, the K-9 handler, responded about 40 minutes later, "[I]ll bite em." Exh. 107 at 5. Rombough testified that he was serious when he said, "deal," and that he took Amiri's statement that he would "bite em" seriously based on their relationship. Tr. at 662-63.

Rombough testified about another suspect with the initials B.S., who he (after texting Amiri, "let's find something good tonight," Exh. 102, p. 546) chased and caught on a night he was working with Amiri in June 2019. Tr. at 649- 651. Rombough punched B.S. even after B.S. was handcuffed.

Amiri stopped Rombough but only because "[t]he sergeant is on his way." *Id.* at 653.

On July 28, 2020, writing to Rombough about a local with criminal history named M.C., Amiri said: "I was hoping we could set up a dog bite and fuck him up." Exh. 102 at p. 2363. Rombough replied: "Ok bro. I'm gonna try to catch him rolling." *Id.* Rombough testified that he understood Amiri to mean, "We'd frame him…" Tr. 629.

Rombough explained that officers avoided documenting uses of force by getting together in the report writing room or wherever they wrote their reports, where they "ma[d]e sure your reports matched each other's." Tr. at 516. Rombough testified to examples where he used force and did not report it. For example, he did not write in his report that he punched B.S. after B.S. was handcuffed, following the incident with Amiri described above. Tr. at 651. Regarding another incident, he once texted J.E.: "6 muzzle thumps and me trying to kick his head over the fence…Brock salty and I in a backyard with no cameras lol." Exh. 106 at 140. He testified that he omitted the head kick from his report and also explained what he meant in his text to J.E.: "That we could have got away with anything in the backyard. There was no cameras." Tr. at 655-656. He testified that he trusted J.E. not to report him. Tr. at 656. Similarly, about an incident at which they were both present and had BWC, Amiri texted Rombough: "do me a solid. don't face me and record my coo sniffs on bwc. it will open the door for defense to criticize the alert. my angle doesn't get it all." Exh. 102 at 3771. Rombough responded: "I got you. I'll [p]osition myself a little diff next time. I didn't want you to get ran over by him. I was gonna smoke him." Exh. 102 at 3773. Rombough explained that text in his testimony: "If there was a body-worn camera, it would actually capture the incident or him giving the dog a command versus what would be written in the report. If there was no body-worn camera, then he could write whatever he wanted on how the dog alerted." Tr. at 644.

Rombough testified that Wenger made statements to Rombough after he broke C.Y.'s arm and shot D.S. with the 40mm launcher. Specifically, after Wenger broke C.Y.'s arm in October of 2019, he stopped to talk about it with Rombough in the hall at Antioch Police Department. Rombough testified that Wenger told him, "Bitch got what she deserved." Tr. at 662. Later, after Wenger used the 40mm launcher for the first time, on D.S. in October 2021, he told Rombough, "You would have been proud of me." Tr. at 663.

Finally, Rombough testified about his involvement in an officer-involved shooting (OIS) incident in December 2021, in which a suspect wearing body armor and a helmet was shooting a firearm outside his residence. *Id.* at 664. Rombough and other officers had trouble communicating because their radios did not work in that location in Antioch. *Id.* After the police engaged the suspect, he began shooting at the police and lit his residence on fire. Tr. 664–65. Rombough and other officers eventually fired at the suspect until he was "neutralized." *Id.* Rombough testified that this shooting incident deeply affected him:

> Q. DID THIS INCIDENT GIVE YOU REASON TO REFLECT?
>
> A. YES, MA'AM.
>
> Q. WHAT WAS THE NATURE OF YOUR REFLECTION?
>
> A. TWO DAYS PRIOR TO THAT, I HAD FOUND OUT THAT MY WIFE WAS PREGNANT, AND DUE TO THE WAY THAT THE SITUATION WAS HANDLED AFTER THE FACT MADE ME REALIZE THAT WE WERE JUST PAWNS, OR SPOKES IN A WHEEL THAT COULD BE EASILY REPLACED IF WE BURNED OUT.

Tr. 665-66. Rombough later went to testify:

> Q. AND AFTER THAT EVENT, YOU BECAME VERY DISENCHANTED WITH ANTIOCH; CORRECT?
>
> A. YES, SIR.
>
> Q. BECAUSE YOU FELT THAT THE LACK OF RESOURCES, THE PROBLEMS WITH THE RADIOS, IT WAS PUTTING YOUR LIFE AND OTHER LIVES AT RISK?
>
> A. YES, SIR.
>
> Q. SO YOU DECIDED TO LEAVE LAW ENFORCEMENT, BUT YOU DECIDED TO TRY TO LATERAL SOMEWHERE ELSE?
>
> A. YES, SIR.

Tr. 753.

Similarly, in the March 2025 trial, Rombough testified about the impact this incident had on him:

> Q. Following your experience with this incident, did it give you reason to reflect on your work as a law enforcement officer?
>
> A. It did.
>
> Q. How so?

> A. I realized this was the only OIS since I have been at APD that we had never debriefed, never allowed to debrief. It kind of hammered the point home that the leadership and everyone didn't care about you.
>
> Q. You said the letters "OIS." What does that stand for?
>
> A. Officer-involved shooting.
>
> Q. And following this incident, did it present some kind of turning point for you?
>
> A. Yeah. Within, I would say, a month or so, I had left the gang unit and the SWAT team, and just decided to be a normal patrol officer until I could leave.
>
> Q. And as time passed after this incident, did you have more moments to reflect on your time that you spent enforcing the law in the City of Antioch?
>
> A. I did.
>
> Q. And what did you reflect on?
>
> A. That I started off with good intentions and doing things for the right reason, but being surrounded by horrible things on a daily basis, you -- your brain -- and being surrounded by that, corrupts your brain.
>
> Q. And during those reflections, did you come to find that you had been corrupted?
>
> A. I did.
>
> Q. And did you come to find that the things you did while you were at the Antioch Police Department, some of the things you testified about today, were those things -- were those things wrong?
>
> A. Yeah. And I felt a huge sense of shame. Still am.

Mar. 6, 2025 Tr. 937.

## II. DISCUSSION

While Rombough's psychiatric evaluation may be considered "newly discovered" under Fed. R. Crim. P. 33, given its provision by Rombough's counsel in March 2026 after the conclusion of Wenger's trial and sentencing before this Court, it plainly fails each of the last three prongs of the test in the Ninth Circuit for a defendant seeking a new trial.

First, Rombough's psychiatric evaluation offers no new information that would be material to the issues at trial. Referencing the psychiatric evaluation, Wenger emphasizes that "for much of the

conspiracy period, Rombough was [redacted] from December 10, 2021 onwards," and that the psychiatric professional found "Rombough was [redacted] since December 2021." Memo at 12–13. But all of Rombough's core testimony about the conspiracy at APD—in the defense's words, describing "a super cop, known as Rambo, respected by his peers and supervisors for his regular deployment of force . . . [h]is regular use of unreasonable force was rewarded with a series of assignments to specialty squads, and he liked dishing street justice" (Mem. at 14)—describes events and actions that took place *before* the December 10, 2021 shooting. Grasping at straws, Wenger goes on to argue "Rombough reported that even prior to the December 2021 shooting, [redacted] Not so. Wenger's selective quotation misstates the report entirely, which instead reads:

[redacted]

(Dkt. No. 692-1 at Page 4 of 41.) Contrary to Wenger's argument, Rombough's psychiatric evaluation is consistent with his prior testimony. To the extent there is any arguably new evidence in the evaluation, it is certainly not material to the issues at trial: at no point did the government suggest or argue that Rombough was a perfect, or even model, officer—far from it.

Moreover, the information provided in the evaluation is also cumulative of the evidence presented at trial. Indeed, Rombough specifically testified about the December 10, 2021 shooting at trial, and how it deeply affected him and made him "disenchanted," how it made him "reflect," and how it served as a "turning point" for him as he left his specialty work assignments and planned to depart from APD. *See* supra. The psychiatric evaluation confirms this, with Rombough "report[ing] that the [December 10, 2021 incident] [redacted]

[redacted] (Dkt. No. 692-1 at Page 4 of 41.) There is no change in the narrative, and nothing in the psychiatric evaluation casts doubt on Rombough's testimony about the conspiracy, where the key events took place *before* December 2021. The psychiatric evaluation certainly provides no evidence "so powerful that, if it were to be believed by the trier of fact, it could render the witness' testimony totally incredible," as required by law to be more than "merely impeaching." *Davis*, 960 F.2d at 825.

Even if Rombough's psychiatric evaluation could be considered marginally material, which it is not for the reasons above, Wenger cannot show that a new trial would probably result in acquittal. Instead, there is significant other evidence in the record implicating Wenger in the conspiracy, including a host of text messages between and among the defendants confirming their agreement. Among other things, Wenger sent a message to Amiri and Rombough asking them to "fuck this guy in the ass" and sent them a photo of the suspect. Rombough responded "deal." Amiri responded, "i'll bite em." (Ex. 107 at 3, 5.) Wenger and Amiri also exchanged messages regarding an incident where Pittsburg Police Department Officers activated body cameras during an encounter with a suspect. Amiri wrote to Wenger that they would have "fucked" the individual up more if the body worn cameras were not activated. Wenger responded by emphasizing Amiri's message and stating that is why he does not like body worn cameras. (Ex. 255 at 61-64.) Other witnesses testified about Wenger's involvement in an investigation relating to a robbery at a Spirit Halloween Store in October 2019 and a subsequent encounter with the suspects. C.Y. testified that Wenger pushed her up against a wall, and she heard her arm "crack[]." C.Y. also testified that Wenger slammed her sister's head into a police car. (Tr. at 268:9-276:10.) A bystander video of the encounter did not align with Wenger's incident and use of force reports. (Ex. 651 (Incident Report), Ex. 667 (Use of Force Report), Ex. 669 (bystander video).) Accordingly, Wenger cannot show that a new trial in this case, even with the "newly discovered" evidence, would probably result in acquittal.

In sum, Wenger falls far short of showing an "exceptional case[] in which the evidence preponderates heavily against the verdict." *Pimentel*, 654 F.2d 545. Wenger fails to raise any "real concern that an innocent person may have been convicted." *Barama*, 2023 WL 2530994. Wenger's motion for a new trial should be denied.

//

## III. CONCLUSION

For the foregoing reasons, this Court should consider Wenger's motion for an indicative ruling and deny Wenger's motion for a new trial. Specifically, because an appeal has been docketed, this Court should deny Wenger's motion under Rule 33(a) for a new trial on the merits, pursuant to Rule 37(a).

DATED: August 14, 2026

Respectfully submitted,

CRAIG H. MISSAKIAN
United States Attorney

/s/
ERIC CHENG
Assistant United States Attorney